## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Case No. 2:21-CR-129 |
| | : | |
| ARMANDO RIVERA-SERENO | : | CHIEF JUDGE MARBLEY |
| Defendant. | : | |

### DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

Now comes the defendant, Armando Rivera-Sereno, through undersigned counsel, hereby moves this Court, to dismiss the indictment against him whereas 8 U.S.C. § 1326 violates Equal Protection under *Arlington Heights1*

Respectfully submitted,

DEBORAH L. WILLIAMS
FEDERAL PUBLIC DEFENDER

 /s/ Stacey MacDonald
Stacey MacDonald (WA 35394)
Assistant Federal Public Defender
10 West Broad Street, Suite 1020
Columbus, Ohio 43215-3469
Telephone: (614) 469-2999
Facsimile: (614) 469-5999
Stacey_MacDonald@fd.org

Attorney for Defendant
Armando Rivera-Sereno

---

1 *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)

## MEMORANDUM IN SUPPORT OF MOTION

## I.     INTRODUCTION

Mr. Rivera-Sereno was indicted with one count of Illegal Reentry of an Alien pursuant to 8 U.S.C.§ 1326. Before Section §1326 was enacted in 1952, Congress first criminalized unlawful reentry in 1929 as part of the Undesirable Aliens Act ("The Act of 1929).2 *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018, ch. 690, 70 Congress, 45 Stat. 1551 (1929).   The Immigration and Nationality Act of 1952 ("INA"), often referred to as The McCarran-Walter Act ("McCarran-Walter Act"), again codified the unlawful reentry provision first passed in 1929 under Title 8 of the United States Code, at 8 U.S.C.A. § 1326.3 Section 1326 was amended in 1988, 1990, 1994 and 1996, with increasing deterrent sentences.

In April 2020, the Supreme Court relied on historical evidence of a state's legislature's racial motives to strike down a criminal law enacted a century earlier.

---

2 The statute reads" "That (a) if any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this act, he shall be guilty of a felony and upon conviction thereof shall unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000 or both such fine and imprisonment." Undesirable Alien Act, Pub. L. No. 70-1018, ch. 690, 45 Stat. 1551 (1929).

3 The Relevant statute reads "any alien who – (1) has been arrested and deported or excluded and deported, and thereafter (2) enters, attempts to enter, or is at any time found in the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act, shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both."   Immigration and Nationality Act, Pub. L. No. 82-414, § 276, 66 Stat. 229 (codified at 8 U.S.C. § 1326 (1952)).

*See Ramos v. Louisiana*, 140 S.Ct. 1390 (2020) Although the law was later reenacted with no evidence of animus, the Court refused to ignore the "racially discriminatory *reasons* that [the state] adopted [its] peculiar rules in the first place." *Id* at 1401. (emphasis in original). Even the justices' "shared respect for rational and civil discourse" could not "supply an excuse for leaving an uncomfortable past unexamined." *Id.* at 1401 n.44

An in depth examination of the history of §1326 will shed light on its racially discriminating intent and disparate impact on Mexicans and Latinx, and thus the violation of Mr. Rivera-Sereno's constitutional right to Equal Protection.

## II.   LEGAL ANALYSIS

### A. Legal Framework

The Fifth Amendment of the United States Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.   This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws.   *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n. 1 (2017).

All criminal defendants are entitled to the Constitutional guarantee of due process of law secured by the Fifth Amendment, regardless of immigration status. *See Wong Wing v. United States*, 163 U.S. 228, 238 (1896)('[E]ven aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due

process of law."); *United States v. Mendoza-Lopez*, 481 U.S. 828, 837 (1987) (noting that Section 1326 must "comport with the constitutional requirement of due process"). Furthermore, the federal government's plenary power over immigration matters does not provide it license to enact racially discriminatory statutes in violation of the Equal Protection of the Fifth Amendment.

A law may violate equal protection in three ways. First, a law may discriminate on its face.[4] Second, authorities may apply a facially neutral law in a discriminatory manner.[5] Third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group.[6]

Here, Mr. Rivera-Sereno challenges § 1326 under the third rationale, and thus the legal framework of *Arlington Heights* applies. Under *Arlington Heights,* the challenging party must demonstrate: (1) disparate impact; and (2) that "racially discriminatory intent or purpose" was a "motivating factor in the decision." 429 U.S. at 265-68. Determining discriminatory intent requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," including, but not limited to: "[t]he historical background of the decision"; "[t]he legislative or administrative history"; "[t]he specific sequence of events leading to the challenged action'; "[d]epartures from normal procedural sequence"; or whether the impact of the law "bears more heavily on one race than another." *Id* at 266-68.

---

4 *See, e.g. Loving v. Virginia,* 388 U.S. 1 (1967)
5 *See, e.g. Yick Wo v. Hopkins*, 118 U.S. 356 (1886)
6 *See, e.g. Arlington Heights,* 429 U.S. at 265-268

The threshold for satisfying these factors are low. Since legislatures are rarely motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights,* 429 U.S. at 265-66. Instead, the challenger need only show "proof that a discriminatory purpose has been a *motivating factor* in the decision." *Id* at 265-66 (emphasis added).

If a racially discriminatory intent or purpose was a motivating factor in the challenged decision, the burden then shifts to the government to establish that "the same decision would have resulted even had the impermissible purpose not been considered." *Id* at 270 n. 21; *See also Hunter v. Underwood*, 471 U.S. 222, 228 (1985)(if racial discrimination was a motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."). If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation", the law violates the Fifth Amendment and must be invalidated." *Id* at 225. *See also, Hunter v. Underwood*, 471 U.S. 222 (1985)(Alabama constitution that barred voting for any person convicted of a "crime involving moral turpitude" disenfranchised ten times as many blacks as whites, even though provision was neutral on its face)

### B. Congress Enacted Illegal Reentry with a Racially Discriminatory Intent or Purpose

While not exhaustive, the five *Arlington Heights* factors constitute the "proper inquiry in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S at 268.

1. *Historical Background of the Undesirable Aliens Act*

Historians often refer to the 1920s as the "Tribal Twenties" – a time when "the Ku Klux Klan was reborn, Jim Crow came of age, and public intellectuals preached the science of eugenics." Exhibit A, Declaration of Dr. Kelly Lytle Hernandez, Professor History at the University of California, Los Angeles, at 2. World War I had produced "a feverish sentiment against presumably disloyal 'hyphenated Americans,'" and "few could resist the combination of nativism, job scarcity, and anti-Bolshevism that fueled the politics of restriction." 7 Prominent restictionists "spoke increasingly of 'racial indigestion,'"8 and "the 'contamination' of Anglo-American society."9

The decade also brought a flood of immigration legislation fueled by fears of "non-white" immigration.10 Many politicians, especially those popularly known as "nativists", hoped to "restrict and even end immigration to the United States from every region of the world other than Western Europe." Exhibit A, *Hernandez Declaration at 2.* At the start of the decade, Congress passed the first numerical restriction on immigration in the United States.11 During the remainder of the decade, legislators aimed for "America [to]cease to be the "melting pot,""12 Although the arrival of southern and eastern Europeans in the early 1900s "fueled

---

7 Mae M. Ngai, *Impossible Subjects,* 19, 20 (2004 William Chafe, et al.).
8 *Id.* at 23
9 Kelly Lytle Hernandez, *Migra!: A History of the U.S. Border Patrol,* 28 (2010).
10 *See generally* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America* (2019)
11 Emergency Immigration Act of 1921, Pub. L. 67-5, 42 Stat. 5 (1921).
12 Ji Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration,* 2020, 3 (2020)(quoting Senator David A. Reed).

the rise of American manufacturing," nativists saw these groups as "undesirable immigrants" "who were "socially inferior, culturally alien, and politically suspect."13

These fears of non-white immigration were bolstered by the growing acceptance of eugenics – a theory that "captured the imagination of many of America's leading intellectuals."14 The popular magazine *The Saturday Evening Post* ran articles warning that new immigrants were racially inferior, impossible to assimilate, and a threat to stability and democracy.15 The leader of a major scientific institution contended that neither education nor environment could alter the "'profound and inborn racial differences' that rendered certain people inferior.'"16 And states throughout the country were drafting laws "based on this burgeoning race science, including aggressive sterilization programs."17

At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of Eugenics Record Office.18 Dr. Laughlin was well known for his model sterilization law that many states and countries, including the Third Reich of Nazi Germany, used as a template.19 During the 1920s, Dr. Laughlin testified before Congress multiple times and produced four reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the

---

13 Hernandez, *supra*, at 28.
14 Yang, *Supra* at 35
15 *Id.* at 8.
16 Okrent, *surpa* at 3.
17 *Id* at 38. Those sterilization laws were affirmed in *Buck v. Bell*, 274 U.S. 200, 207 (1927).
18 Ngai, *supra*, at 24.
19 *Harry Laughlin and Eugenics,* Truman State University. Accessible at
https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/.

"individual quality of future populations." Exhibit B, *The Eugenical Aspects of Deportation: Hearings before the Committee on Immigration and Naturalization House of Representatives,* 70th Cong. 70.1.4, pp 2, 3, (1928). Relying heavily on these theories, Congress would anchor its immigration legislation in eugenics and racial inferiority for the remainder of the decade.20

## 2. *Specific Sequence of Events Leading Up to the Challenged Action*

In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable" immigrants – which was often code for "non-white." *See Ave 6E Investments, LLC v. City of Yuma, Ariz,* 818 F. 3d 493, 505-06 (9th Cir. 2016)("the use of 'code words' may demonstrate discriminatory intent"). The first such law was the National Origins Act of 1924, which established quotas based on the national origins of U.S. citizens as reflected in the 1920 census.

The quotas created by the National Origins Act were skewer to keep the nation's "racial strains" predominately Anglo-Saxon.21   The law on its face did not count "nonwhite people residing in the United States" towards the quotas it established.   Indeed, its newly-created "Quota Board" interpreted this provision to exclude all Black people: all East and South Asians (including those who had American citizenship by birth); and all citizens in Hawaii, Puerto Rico, and Alaska.22   Congress and the president accepted these exclusions under pressure to

---

20 *See* E.P. Hutchinson, *Legislative History of American Immigration Law, 1798-1965*, 212-13 (1981).
21 Ngai, *supra* at 24-25
22 *Id*. at 26

"stand firm against the efforts of 'hyphenates' who would 'play politics with the nation's blood stream.'"23

Yet there was a wrinkle in the National Origins Act – it did not set quotas on immigrants from countries in the Western Hemisphere. This was due to the influence of large agricultural businesses that relied heavily on labor from just over the border.24 These agri-businesses pressured legislators from western states to vote against the law, forcing nativists in Congress to "choose between accepting a Mexican quota exemption or passing no immigration law at all." Exhibit A, Hernandez Declaration at 3. As one representative complained, there was no chance of capping the number of Mexican immigrants because too many growers were "interested in the importation of these poor peons." Exhibit C, Representative Box (TX). "Deportation of Aliens" *Congressional Record,* (Feb 16, 1929) p. H3619.

Despite passing the most sweeping immigration laws in years, legislators were not happy. Representative Patrick O'Sullivan criticized the restrictions on Italian immigrants, stating that "the average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a mongrel." Exhibit D, Representative O'Sullivan, "Administration of the Law." *Congressional Record* 65:6 (1924) p H5900. Legislators proposed bill after bill restricting Mexican immigration but none could survive opposition from southwestern growers. Exhibit A, Hernandez Declaration at 5. To solve this problem, a group of key figures began

---

23 *Id.* at 35
24 *See* Hans P. Vought, *The Bully Pulpit,* 179 (2004)

to strategize a new type of immigration bill that would approach immigration from a criminal – rather than a civil – angle.

### 3. *Relevant Legislative or Administrative History*

After passage of the National Origins Act of 1924, the Department of Labor (which governed the Bureau of Immigration) began implementing Congress's new quota system.25  Then-Secretary of Labor James Davis was a strong advocate of Dr. Laughlin and his eugenics theories – even using them as the basis for policies he had developed and published under the title "Selective Immigration or None."26 Davis warned that the "rat type" was coming to the United States, and that these "rat men" would jeopardize the American gene pool.27

Secretary Davis was nevertheless torn between his belief in eugenics and his responsibility to maintain a large labor supply for the railroad and agriculture industries.28  So together with devout racist (and suspected Ku Klux Klan member) Senator Coleman Blease,29  Davis developed a compromise – Congress would criminalize border crossing *after the fact*, rather than *prevent* it in the first place.30 That way, authorities could expel Mexicans through a criminal prosecution after the growing season was over, thereby avoiding resistance from businesses that

---

25 *See* Vought, *Supra*, at 174-79.
26 *Id.*
27 *Id*. at 174-75.
28 *Id*. at 216
29 For biographical and historical context about Senator Blease, *See* B. Simon, *The appeal of Cole Blease of South Carolina: Race, Class and Sex in the New South,*  The Journal of Southern History, 62:1, pp 57-88 (Feb. 1996), *available at* https://www.jstor.com/stable/2211206
30 Ian MacDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy,* ProPublica (June 19, 2020) https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy

depended on Mexican labor.31 The southwest growers were in agreement – as one put it, "We, in California, would greatly prefer some set up in which our peak labor demands might be met and upon the completion of our harvest these laborers returned to their country." Exhibit A, Hernandez Declaration at 7.

Secretary Davis and Senator Blease found two eager collaborators in the House of Representatives, both of whom were on the powerful Immigration and Naturalization Committee. Representatives John C. Box from Texas had long characterized the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization." Exhibit E, Representative Box (TX). "Restriction of Mexican Immigration" *Congressional Record* (Feb. 9, 1928) pp H2817-18. In one speech at an immigration conference, Rep Box had explained that

> [t]he Mexican peon is a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction but submitted and multiplied as serfs. Into that was fused much negro slave blood…The prevention of such mongrelization and the degradation it causes is one of the purposes of our [immigration] laws.

*Id.* Box believed this importation was "raising a serious race question" because Mexicans were "essentially different from us in character, in social position." Exhibit C at H3619.

Box was joined by the influential Chairman of the House Immigration and Naturalization Committee, Representative Albert Johnson of Washington.

---

31 *Id.*

Chairman Johnson – for whom the 1924 "Johnson-reed" National Origins Act was named – was an "energetic and vehement racist and nativist."32  He headed the Eugenics Research Association, a group that opposed interracial marriage and supported forced sterilizations.33  He also proudly described his 1924 law as a "bulwark against 'a stream of alien blood, with all its inherited misconceptions respecting the relationships of the governing power to the governed.'"34  Within two years of the 1924 Act, Chairman Johnson turned to legislation that would exclude the "Mexican race," explaining that while the argument for immigration restriction had previously been economic, now "the fundamental reason for it is biological."35

Following the lead of these legislators, other lawmakers soon "turned to narratives of racial threat to justify restriction."36  In 1928, Representative Robert A. Green of Florida delivered a radio speech (later read into the congressional record by Representative Lankford) that advocated for Western Hemisphere quotas. He asserted that countries south of the United States are "composed of mixed blood of White, Indian and negro." Exhibit F, Representative Lankford. "Across Borders", Congressional Record (Feb. 3, 1928) p H2462.  Immigration from these countries, he believed, created a "very great penalty upon the society which assimilates," and

---

32 Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island*, p. 242-43 (2002).

33 *Id.*

34 Roger Daniels, *Guarding the Garden Door,* p. 55 (Hill and Wang, 2004).

35 Okrent, *Surpa* at 3.

36 Benjamin Gonzalez O'Brien, Chap. 1, *Handcuffs and Chain Link* (2018) (Kindle edition)

put it at a disadvantage to countries that have "kept their blood white and purely Caucasian." Exhibit F, at H2462.

Chairman Johnson soon convened hearings on new immigration legislation. See Exhibit G, Hearings Before the Committee on Immigration and Naturalization, 69th Cong. 69.1.3 (1926).   At the first hearing, Chairman Johnson admitted into the record a letter from a constituent in El Paso who urged the legislators to keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico." Exhibit G, at 30.   In response to this letter, Commissioner General of Immigration Harry Hull, stated, "I think he is right".   Exhibit G, at 30. Rep. Box added, "I have some letters, Mr. Chairman, just like that." Exhibit G, at 30.

The following month, the same House committee held a hearing on "The Eugenical Aspects of Deportation," where the principal witness was the well-known eugenicist Dr. Laughlin.   Exhibit B, at 1.   Early in the hearing, Chairman Johnson praised Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and fecundity, describing one as a "priceless" resource that would "bear intimately on immigration policy." Exhibit B. at 3.

Dr. Laughlin testified about his latest eugenics report, the goal of which was to "protect American blood from alien contamination." Exhibit B at 3.   When Dr. Laughlin encouraged the committee to conduct future research on the effect of "race crossing within the United States," Chairman Johnson replied that such a study would "be of great use to the committee in its deliberations." Exhibit B, at 11.

Dr. Laughlin discussed the need for further research into "mate selection," because "whenever two races come in contact there is always race mixture" even though the 'upper levels tend to maintain themselves because of the purity of the women of the upper classes." Exhibit B at 19.    The job of any government, Dr. Laughlin explained, was to "demand fit mating and high fertility from the classes who are better endowed physically, mentally, and morally by heredity." Exhibit B at 19.    By deporting or excluding the "lower races" from the country, Dr. Laughlin contended, "[i]mmigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation." Exhibit B at 19.

In response, Chairman Johnson advocated for Congress's use of the "principle of applied eugenics" to "do everything possible" to reduce crime by "debarring and deporting" more people. Exhibit B, at 25.    Rep. Box agreed, stating, "we will have to control immigration to suit our own needs or we will lose our national character," which would" spell destruction for the future of America." Exhibit B, at 25.

Dr. Laughlin even compared the drafters of deportation laws to "successful breeders of thoroughbred horses," who would never consider "acquiring a mare or a stallion not of the top level" for their "stud farm." Exhibit B, at 44.    One such successful breeder he knew "weeds out from the lower levels and recruits by purchase" – a process that is "analogous to immigration in man." Exhibit B, at 44-45.    "Man is animal," Dr. Laughlin explained, "and so far as heredity and future generations are concerned, there is considerable real basis for [this]comparison." Exhibit B, at 45.

When such racial engineering is not possible, Dr. Laughlin warned, deportation of the "undesirable individual" becomes even more critical; otherwise, "we cannot get rid of his blood no matter how inferior it may be, because we cannot deport his offspring born here." Exhibit B, at 45. Dr. Laughlin predicted that so long as the nation's borders remained open to immigrants, "there will always be need for deportation, or for the 'final selection.'" Exhibit B, at 44. In response to this testimony, Chairman Johnson agreed that "[i]mmigration looks more and more like a biological problem, and if the work of this committee results in establishing this principle in our immigration policy we will be well repaid for our efforts." Exhibit B, at 46.

Though Chairman Johnson's initial legislation failed, the compromise with the agricultural industry brokered by Secretary Davis and Senator Blease soon made a breakthrough. On January 18, 1929, Senator Blease, on behalf of the Senate Committee on Immigration, submitted a report to the full Senate recommending passage of a law that would penalize "aliens who have been expelled from the United Sates and who re-enter the county unlawfully." Exhibit H, S. Rep. No. 1456, at 1 (1929). This report was accompanied by a letter from Secretary Davis on behalf of the Department of Labor advocating for passage of the law. Exhibit H, at 2.

The following week, Senator Blease presented this bill on the Senate floor, where he reported that Chairman Johnson had "asked me to get the measures over to the House [within two days] if I possibly could." Exhibit I, Senator Blease (SC).

*Congressional Record*, (Jan 23, 1929) p. S2092.  The full Senate passed the bill with almost no discussion or debate.  Exhibit I, at S2092.  Two weeks later, Chairman Johnson submitted a report from the Committee of Immigration and Naturalization to the full House recommending passage of the illegal re-entry law. Exhibit J., S. Rep. No. 2397 (1929)

During debate on the bill, Rep. Thomas L. Blanton complained that Mexicans "come into Texas by hordes" and that "my friend Judge Box has been making a just fight against the situation for years." Exhibit C, Cong. Rec. 1929. Rep. Blanton urged the House to "apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there." Exhibit C, Representative Blanton, "Deportation of Aliens", *Congressional Record* (1929) p. H3619, Rep. Schafer added that "[t]hese Mexicans also come into Wisconsin in droves," and Rep. Blanton challenged others to visit the international ports of entry in Texas to see the "hordes that come across the bridges with no intention of every going back." Exhibit C, at H3619. Rep. Fitzgerald then added that from a "moral standpoint," Mexicans were "poisoning the American citizen" because they are "of a class" that is "very undesirable." Exhibit C, Representative FitzGerald, "Deportation of Aliens." *Congressional Record* (1929) p. H3620.

Minutes later, the bill passed the House of Representatives. Exhibit C, H3621. The president signed it into law three days later.  Exhibit K, 70th Cong. Sess. II, Chap. 690, Mar. 4, 1929.

This legislative history easily clears the low threshold of showing that racism and eugenics were a "motivating factor" under the first three factors.   Like other *Arlington Heights* cases, passage of the racially-motivated law followed a predictable pattern.   A broad social movement founded on principles of white supremacy and eugenics gained popular support in the 1920s.   *Compare Hunter*, 471 U.S. at 229 (discussing "a movement that swept the post-reconstruction South to disenfranchise blacks"). Dr. Laughlin, a notorious eugenics "expert," promoted theories of racial inferiority through multiple reports and testimony to Congress. Key lawmakers like Chairman Johnson, Senator Blease, and Representative Box (along with Secretary of Labor Davis) promoted these theories and repeatedly endorsed them during legislative sessions.   And even Congressmen who might not have otherwise endorsed racially motivated legislation were consistently advised of the "inferiority" of the "Mexican race" during legislative sessions in the five years leading up to the law's passage.   In other words, the evidence of racial discrimination in the legislative history and events leading up to the passage of the 1929 law easily meets – if not exceeds – the evidence requirement in *Arlington Heights*.

4. *The Legislature's Departure from Normal Procedures or Substantive Conclusions*

Examining the next *Arlington Height's* factor – whether "the legislature's departure[] from normal procedures or substantive conclusions." *Id*. at 429 U.S. at 265-68.   Here, not only do the overtly racists statements of legislators during the

law's passage show its discriminatory purpose, several irregularities and illogical conclusions in the passage of the 1929 law also implicate this factor.

First, the 1920s was the first and only era in which Congress openly relied on the now discredited theory of eugenics to enact immigration legislation. Both the 1924 and the 1929 immigration laws drew heavily on Dr. Laughlin's debunked beliefs that immigration control was a matter of racial engineering, akin to horse breeding. And while Congress ultimately acknowledged the discriminatory origins of the National Origins Act of 1924 and repealed it in 1965, illegal reentry remains one of the few laws still in effect from that era.

Second, the racial vitriol expressed during the debates was directed almost exclusively at Mexicans – even though Canadians were also entering the United States in record numbers. See Exhibit C, at H3621 (stating that 81,506 Canadians entered the United States in 1928). If the 1929 Act were motivated by generalized xenophobia or economic anxiety, rather than racism, one would expect legislators to criticize foreigners across the board. But no legislator referred to Canadians as "mongrels"; none complained of "hordes" of Canadians crossing the border; none objected that Canadians were "poisoning the American citizen." And a representative from Wisconsin complained only about Mexicans taking jobs, not Canadians. *See* Exhibit C, at H3619. These irregularities show that not only was Congress's passage of the Undesirable Alien Act based on eugenics and racism, it also departed from typical substantive conclusions underlying immigration law.

5. *Impact of the Official Action and Whether it Bears More Heavily On One Race Than Another*

Within a year of the 1929 law's passage, the government had prosecuted 7,001 border crossing crimes; by 1939, that number rose to over 44,000.37  In each of these years, the individuals from Mexico comprised no fewer than 84% of those convicted, and often made up as many as 99% of defendants.38  And the number of prosecutions has soared – in the last four years, the number of §1326 cases has risen nearly 40% to 22,077,39  making illegal reentry one of the most common federal felonies today.   In the fiscal year of 2020, during a global pandemic, there were 19,654 offenders convicted of illegal reentry, accounting for 82.7% of all immigration offenders sentenced under the guidelines.40

In sum, applying the five *Arlington Heights* factors shows that racism and eugenics were, at a minimum, a "motivating factor" in the passage of the Undesirable Aliens Act.   And as new Supreme Court precedent confirms, courts must consider this historical evidence in determining whether a statute is constitutional.

**C. New Supreme Court Precedent Confirms that Discriminatory Purpose is Relevant to a Law's Constitutionality and Cannot Be Cleansed Solely by a Re-enactment**

---

37 *Annual Report of the Attorney General of the United States for the Fiscal Year 1939,* 37; Kelly Lytle Hernandez, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles,* 1771-1965, n. 6 at 138-39 (UNC Press, 2017).
38 Hernandez, *supra* n. 6, at 138-139 (citing U.S. Bureau of Prisons, *Federal Offenders,* Fiscal Years, 1931-36
39 *See* United States Sentencing Commission, *Quick Facts: Illegal Reentry Offenses,* Fiscal Year 2019, *available at:* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/illegal_reentry_fy19.pdf.
40 *Id.*

Two recent Supreme Court cases confirm that a discriminatory purpose that fueled a law's original enactment remains relevant in determining its constitutionality.  In *Ramos v. Louisiana,* the Court struck down a state law permitting convictions by non-unanimous juries, citing the "racially discriminatory *reasons* that Louisiana and Oregon adopted their peculiar rules in the first place." 140 S. Ct. at 1401 (emphasis in *Ramos)*. Although Justice Alito argued in his dissent that both states later recodified their non-unanimity rules with no mention of race, the majority rejected the notion that this cured the laws' original animus, holding that if courts must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve." *Id*. at 1401 n. 44. Nor could the justices' "shared respect for rational and civil discourse. . . supply an excuse for leaving an uncomfortable past unexamined." *Id*. (citation and quotations omitted).

Two months later, the Supreme Court struck down a Montana law prohibiting families from using state-sponsored scholarships at religious schools. *See Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020).  The majority relied on the law's "checkered tradition" of underlying religious discrimination, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry." *Id* at 2259.

Concurring, Justice Alito invoked his *Ramos* dissent, noting its argument that courts cannot examine impermissible motives underlying the original version of a

law where states have "readopted their rules under different circumstances in later years." *Id* at 2268 (quotations omitted). Justice Alito then stated, "But I lost, and *Ramos* is now precedent." *Id*. Justice Alito then provided an extensive history of the anti-Catholic and anti-immigrant motives underlying Montana's law, concluding that "[u]nder *Ramos*, it emphatically does not matter whether Montana readopted the no-aid provisions for benign reasons. The provision's 'uncomfortable past' must still be 'examined.'" *Id* at 2273 (quoting *Ramos*, 140 S. Ct. at 1396, n. 44).

Here, the original illegal reentry law codified in the Undesirable Aliens Act of 1929 has been reenacted several times, most notably in the Immigration and Nationality Act of 1952.41

But *Ramos* and *Espinoza* both confirm that not only do courts examine the racial motivations of a law **at the time of its passage**, later reenactments do not cleanse the law of its original taint. The government may argue that even if racism and eugenics were a "motivating factor" in § 1326's original passage, the law currently serves other legitimate purposes. But laws enacted with a discriminatory purpose cannot be "cured" merely because they later satisfy a non-discriminatory purpose. *See Hunter*, 471 U.S. at 223 (rejecting Alabama's argument that "events occurring in the succeeding 80 years had legitimated" a racially motivated disenfranchisement provision).

---

41 *See* June 27, 1952, c. 477, Title II, ch 8, §276, 66 Stat. 229; Pub.L. 100-690, Title VII, § 7345(a), Nov. 18, 1988, 102 Stat. 4471; Pub.L. 101-649, Title V, § 543 (b)(3), Nov. 29, 1990, 104 Stat. 5059, Pub. L. 103-322, Title XIII, § 130001(b), Sept 13, 1994, 108 Stat. 2023; Pub.L. 104-132; Title VI, §§ 401(c), 438 (b), 441(a), Apr. 24, 1996, 110 Stat. 1267, 1276, 1279; Pub.L. 104-208, Div C, Title III, §§ 305(b), 308(d)(4)(J), (e)(1)(K), (14)(A), 324(a),(b), Sept. 30, 1996, 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629.

Rather, when a court determines that a law's "original enactment was motivated by a desire to discriminate…on account of race and the section continues to this day to have that effect," the court must conclude that the law "violates equal protection under *Arlington Heights*." *Id*. *See also United States v. Fordice*, 505 U.S. 717, 718 (1992)("If the State perpetuates policies and practices traceable to its prior de jure dual system that continue to have segregation in other facets of the university system-and such policies violate the Clause, even though the State has abolished the legal requirement that the races be educated separately and has established racially neutral policies not animated by a discriminatory purpose."

### D. The 1952 Reenactment Did Not Cleanse Section 1326 of Its Racist Origins and Was Also Motivated by Discriminatory Intent

The McWarren-Walter Act of 1952 collected, recodified, and revised the many existing laws governing immigration and reorganized the structure of immigration law statutes. However, the 1952 congress did not just fail to repudiate racial animus, they chose to recodify and make harsher illegal reentry at the same time they expanded grounds for deportation and limited discretionary relief from deportation.   They recodified illegal reentry with knowledge of the law's disparate impact.   They further passed the law over a presidential veto that explicitly called out the law for its racism.

The same congress also passed a few months earlier a discrete piece of alien harboring legislation known as the "Wetback Bill" that exempted employers from prosecution.   Exempting employers, who incentivize illegal immigration and are

vastly more responsive to deterrence than impoverished and uneducated Latinx workers, in the same proverbial breath as reenacting illegal reentry, and with the full knowledge of the disparate impact of illegal reentry on Latinx migrants, is among the many factors demonstrating that racial animus was a motivating factor for the 1952 congress.

To presume that the intent of the 1952 congress differed from the intent of the 1929 congress is undermined by Supreme Court jurisprudence. *E.g.*, *Hunter v. Underwood*, 471 U.S. 222, 232 (1985)(striking down portions of Alabama's constitution based on legislators' racial animus despite the more blatantly discriminatory selections being already struck down by the courts because its original enactment was motivated by a desire to discriminate); *United States v. Ryder*, 110 U.S. 729 (1884)("It will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed"). *Keene Corp v. United States*, 508 U.S. 200, 209 (1993)("[W]e do not presume that the revision worked a change in the underlying substantive law 'unless an intent to make such [a] chang[e] is clearly expressed.")(*quoting Fourco Glass Co. v. Transmirra Prods. Corp.,* 353 U.S. 222, 227 (1957)).

The McCarran-Walter Act reenacted illegal reentry while simultaneously broadening the grounds for deportation and limiting discretionary release from deportation, making more undocumented migrants and documented migrants vulnerable to deportation and thus prosecution upon return. The expansion of

deportations and limitations on discretionary release formed one of the major

critiques from President Truman:

> The bill would sharply restrict the present opportunity of
> citizens and alien residents to save family members from
> deportation.   Under the procedures of present law, the
> Attorney General can exercise his discretion to suspend
> deportation in meritorious cases. In each such case, at
> the present time, the exercise of administrative discretion
> is subject to the scrutiny and approval of Congress.
> Nevertheless, the bill would prevent this discretion from
> being used in many cases where it is now available, and
> would narrow the circle of those who can obtain relief from
> the letter of the law.   This is most unfortunate, because the
> Bill, in its other provisions, would impose harsher restrictions
> and greatly increase the number of cases deserving equitable
> relief.42

The legislative history of both the McCarran-Walter Act and the "Wetback

Bill" continue to demonstrate racial animus that was prevalent in the original 1929

Undesirable Aliens Act.

### E.  8 U.S.C. § 1326 Disparately Impacts Latinx Individuals

*Arlington Heights* requires challengers to show that a law was enacted with a

discriminatory purpose and disparately impacts a particular group. *See* 429 U.S. at

265.   However, the test for disparate impact only requires evidence that Section

1326 "bears more heavily on one race than another." *Id* at 266.

Here, not only were racism and eugenics a discriminatory purpose

motivating the enactment of the first border crossing laws, such laws continue to

---

42 https://www.ruhr-uni-bochum.de/gna/Quellensammlung/10/10_presidenttrumansveto_1952.htm

disparately impact Mexicans and other Latinx defendants. In 2000, over 97% of persons apprehended at the border were Mexican. In 2005, Mexicans made up 86% of apprehensions and in 2010, 87%.43 In the last decade, Mexicans have made up a smaller percentage of arrestees due to increased migration from Central America, but combined, the two groups constitute the overwhelming majority of border crossings.44

The executive branch continues to wield § 1326 as a tool of mass prosecution that disproportionately affects Mexicans and Latin Americans. In April 2018 then-Attorney General Jeff Sessions announced a "zero tolerance" policy targeting illegal entry cases.45 The following month, Sessions made clear at an address delivered in San Diego that "the Department of Homeland Security is now referring 100 percent of illegal Southwest Border crossings to the Department of Justice for prosecution. And the Department of Justice will take up those cases."46

---

43 *Border Patrol Total Apprehensions by Mexico and Other Than Mexico, 2000-2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20bu%20Sector%20%28FY%202013%20-%20FY%202019%29-1.pdf
44 *U.S. Border Patrol Nationwide Apprehensions by Citizenship and Sector, 2007-2019*, https:///www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Nationwide%20Apprehensions%20by%20Citizenship%20and%20Sector%20%28FY%202007%20-%20FY%202019%29_1.pdf

45 *See* "Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry," U.S. Dept. of Justice, Apr. 6, 2018, *available at:* https://www.justice.gov/opa/pr/attorney-general-announce-zero-tolerance-policy-criminal-illegal-entry

46 "Attorney General Session Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration," Dept. of Justice, May 7, 2018, San Diego, California, https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

Both Sessions and Stephen Miller, a senior policy advisor to President Trump and the architect of the zero-tolerance policy,47 have drawn inspiration from the discriminatory immigration laws of the 1920s. In a series of leaked emails, Miller lauded the immigration policies of this era, suggesting to a journalist, "This would seem a good opportunity to remind people about the heritage established by Calvin Coolridge, which covers four decades of the 20th century" – i.e., the decades between the 1924 Act and its repeal in 1965.48 Likewise, in a 2015 interview with Breibart, Sessions expressed alarm at the rising percentage of "non-native born" Americans, noting that when immigration levels were "about this high in 1924," the President and Congress "changed the policy, and it slowed down immigration significantly."49 He warned that repeal of those policies in 1965 had primed the country for a "surge fast past what the situation was in 1924."50

This evidence demonstrates that § 1326 has disparately impacted Mexican and Latinx immigrants and continues to do so today. Combined with Mr. Rivera-Sereno's showing that racial discrimination was a "motivating factor" in its passage, he has satisfied his initial burden under *Arlington Heights* to demonstrate that the law violates equal protection.

---

47*See e.g.,* Julie Hirschfeld Davis & Michael D. Shear, *How Trump Came to Enforce a Practice of Separating Migrant Families,* N.Y. Times (June 16, 2018), https:www.nytimes.com/2018/06/16/us/politics/family-separation-trump-html?login=smartlock&auth=login-smartlock

48 Katie Rogers & Jason DeParle, *The White Nationalist Websites cited by Stephen Miller*, N.Y. Times (Nov. 18, 2019) https://www.nytimes.com/2019/11/18/us/politics/stephen-miller-white-nationalism.html.
49 Adam Serwer, *Jeff Sessions' Unqualified Praise for a 1924 Immigrant Law;* Atlantic (Jan 10, 2017), https:www.theatlantic.com/politics/archive/2017/01/jeff-sessions-1924-immigration/512591/
50 *Id.*

### F.  The Burden Shifts to the Government

Mr. Rivera-Sereno has shown both a discriminatory purpose and a disparate impact underlying § 1326, thus the burden shifts to the government to show that the Undesirable Aliens Act of 1929 would have passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 266-68, 270 n. 21. *See also Hunter*, 471 U.S. at 228 (shifting the burden to the law's defenders to "demonstrate that the law would have been enacted without this factor). If the government fails to make this showing, the Court should dismiss the charge.

### III.    CONCLUSION

WHEREFORE, for the reasons set forth above, defense respectfully requests this Court to dismiss the Indictment as 8 U.S.C. § 1326 violates Mr. Rivera-Sereno's constitutional right to Equal Protection under *Arlington Heights*.

Respectfully submitted,

DEBORAH L. WILLIAMS
FEDERAL PUBLIC DEFENDER

 /s/ Stacey MacDonald
Stacey MacDonald (WA 35394)
Assistant Federal Public Defender
10 West Broad Street, Suite 1020
Columbus, Ohio 43215-3469
Telephone: (614) 469-2999
Facsimile: (614) 469-5999
Stacey_MacDonald@fd.org

Attorney for Defendant
Armando Rivera-Sereno

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Stacey MacDonald
Stacey MacDonald (WA 35394)
Assistant Federal Public Defender