soldiers have never been given a pensionable status, and the pending resolution does not give them a pensionable status.

Of all the States that suffered from border warfare during the Civil War period, Missouri was probably most devastated by the rip tides and cross currents of the opposing armies of the North and South. The Union and Confederate forces alternately swept across the State, leaving woe and desolation in their wake. It was to meet this situation that the Federal Government created the Department of the West and the Department of the Missouri, and by the act of March 25, 1862, Congress provided—

That the Secretary of War be, and he is hereby, authorized and required to allow and pay to the officers, noncommissioned officers, musicians, and privates who have been heretofore actually employed in the military service of the United States, whether mustered into actual service or not, where their services were accepted and actually employed by the generals who have been in command of the Department of the West or the Department of the Missouri, the pay and bounty as in cases of regular enlistment.

This act further gave these officers and privates a pensionable status when wounded or incapacitated for service.

The act of March 25, 1862, placed those who served in Missouri Militia organizations (whose services were accepted, and who were actually used by the generals in command of the Department of the West or the Department of the Missouri, although not actually mustered into the Army of the United States) on a different basis than those who served in militia organizations in other States. They were given this preferred and pensionable status if their services were accepted and actually employed by the generals in command of the Department of the West or the Department of the Missouri.

Mr. TILSON. Is the gentleman ready to assure the House that this joint resolution does not enlarge the class that now draws pensions?

Mr. LOZIER. Yes; this resolution adds no new class to the pension rolls. It will in some instances increase the allowance and remedy present discriminatory conditions. It does not give a pensionable status to any group or class of soldiers or their dependents who have not heretofore had and who do not now have a pensionable status.

Mr. TILSON. But it enables the members of the said class to take advantage of more recent laws. Is that the case?

Mr. LOZIER. Yes; the statement of the gentleman from Connecticut is correct. This resolution extends to the survivors of the Missouri State Militia and the Provisional Missouri Militia who rendered service during the Civil War and their dependents, who now have title to pension under existing law, the advantage of the act of Congress approved May 1, 1920, the act of Congress approved July 3, 1926, and the act of Congress approved May 23, 1928. Under the present law these survivors are receiving $50 per month, and by extending the benefits of these acts to them they will be automatically increased to $65 per month, with further increase to $72 and $90 per month in case of partial or total disabilities. The widows of the Missouri State Militiamen and the Provisional Missouri Militiamen who have title under existing law now receive $30 per month. This will increase them to $50 per month under the provisions of the act of July 3, 1926, if married to the soldier prior to or during the period of his service during the Civil War.

It also allows them the benefits of the provisions of the act of May 23, 1928, increasing their pensions from $30 per month to $40 per month if they have or may hereafter attain the age of 75 years. All widows must show their husbands rendered 90 days or more military service and were honorably discharged from all contracts of service, or, regardless of the length of service, were discharged for or died in service of a disability incurred in the service and in the line of duty, and that they were married to the late soldier prior to June 27, 1905.

As I have stated, there are two precedents extending the benefits of existing pension laws to the survivors of the Missouri State Militia and the Provisional Missouri Militia and their dependents. The first was a House joint resolution approved February 15, 1895, and the second was a House joint resolution approved March 4, 1907. I have already explained these resolutions in detail. The pending resolution extends the benefits of the acts of May 1, 1920, July 3, 1926, and May 23, 1928, so as to include the officers and privates of the Missouri State Militia and the Provisional Missouri Militia and their widows and minor children, just as House joint resolution, approved February 15, 1895, extended the provisions of the act of June 27, 1890, to these classes, and just as House joint resolution, approved March 4, 1907, extended the benefits of the act of February 6, 1907, to these same classes.

Mr. CANNON. Mr. Speaker, the only criticism that can be made of this bill is that it does not go far enough. It should

also provide a pensionable status for all who served during the Civil War in the Missouri Militia and the Provisional Enrolled Missouri Militia and their survivors. Thousands of loyal citizens of the State enlisted in these organizations, were armed and equipped by the Federal Government, commanded by Federal officers, fought side by side with Federal troops, and the State of Missouri has since been reimbursed for their services by the Federal Government. But because in the turmoil of war they did not happen to be sworn into the Federal service, that technicality has excluded them and their widows from the benefits of the pension laws enjoyed by their comrades, who rendered no greater service, endured no greater hardships, and contributed no more loyalty to the preservation of the Union. It is to be hoped that in the near future their patriotic services will be recognized by legislation giving them equal pensionable status. But in the meantime this bill is a step in the right direction. It allows veterans who are now limited to a pension of $50 per month the advantage of recent enactments providing for increases to $65 per month, with a further increase to $72 and $90, respectively, in case of partial or total disabilities. It also permits widows now receiving $30 per month to take advantage of recent legislation authorizing increases to $40 and $50 per month, depending on date of marriage. For this reason the bill should be passed. It is to be hoped that it will also serve to call attention to the need for additional legislation providing for other members of Missouri organizations whose services in the war entitle them to the same consideration but who have for more than half a century been deprived of this deserved recognition.

The SPEAKER. Is there objection to the request of the gentleman from Ohio [Mr. W. T. FITZGERALD]?

There was no objection.

The joint resolution was ordered to be engrossed and read a third time, was read the third time, and passed.

A motion to reconsider was laid on the table.

PERMISSION TO ADDRESS THE HOUSE

Mr. CONNERY. Mr. Speaker, I ask unanimous consent that on Monday next, after the reading of the Journal and disposition of matters on the Speaker's table, I may be permitted to address the House for 30 minutes.

Mr. TILSON. Mr. Speaker, the Consent Calendar is a very heavy one, and I am loath to allow the gentleman to take 30 minutes on Consent Calendar day.

Mr. CONNERY. I will modify my request and ask for 20 minutes.

Mr. SNELL. What is the matter with to-morrow?

Mr. TILSON. Will the gentleman be ready to-morrow?

Mr. CONNERY. No; I am not ready for to-morrow, but I will be ready for Monday or Tuesday.

Mr. SNELL. Tuesday is to be a full day for the Committee on the Merchant Marine and Fisheries. They have two bills that will take the entire day, Mr. Speaker. It would be all right for to-morrow.

Mr. CONNERY. All right, Mr. Speaker. I will try to be ready to-morrow, and will change my request and ask for 30 minutes to-morrow.

Mr. TILSON. So far as I am concerned the gentleman can have as much time as he needs to-morrow.

The SPEAKER. The gentleman from Massachusetts asks unanimous consent that to-morrow, after the reading of the Journal and the disposition of matters on the Speaker's table, he may address the House for 30 minutes. Is there objection?

There was no objection.

IMMIGRATION

Mr. MICHENER. Mr. Speaker, by direction of the Committee on Rules I call up House Resolution 318, a privileged resolution, which I send to the Clerk's desk to have read.

The Clerk read the resolution, as follows:

Resolved, That upon the adoption of this resolution the Committee on Immigration and Naturalization shall have one legislative day for the consideration of the following bills:

H. R. 16927, to clarify the law relating to the temporary admission of aliens to the United States.

H. R. 16026, granting preference within the quota to certain aliens trained and skilled in a particular art, craft, technique, business, or science.

S. 6094, making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law.

That after general debate on each bill, which shall be confined to the bill and shall continue not to exceed one hour, to be equally divided and controlled by those favoring and opposing the bill, each bill shall be read for amendment under the 5-minute rule. In the case of the bill S. 6094, it shall be in order to consider without the intervention

of the point of order, as provided in clause 7 of rule 16, the committee amendment recommended by the Committee on Immigration and Naturalization now in the bill, and such committee amendment for the purpose of amendment shall be considered under the 5-minute rule as an original bill. At the conclusion of the reading of each bill for amendment the committee shall rise and report the bill to the House with such amendments as may have been adopted, and the previous question shall be considered as ordered on each bill and the amendments thereto to final passage without intervening motion except one motion to recommit.

Mr. MICHENER. Mr. Speaker, this rule makes in order three bills reported favorably by the Committee on Immigration and Naturalization. The bills are a bill to clarify the law relating to the temporary admission of aliens to the United States, a bill granting preference within the quota to certain aliens trained and skilled in a particular art, craft, technique, business, or science, and a bill making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law.

I might state that the so-called Schneider bill or naturalization bill is not in issue, neither is the Box quota bill.

This rule simply permits the consideration of these bills under the general rules of the House, permitting one hour general debate on each bill, with the exception that in the consideration of the Senate bill (S. 5604) the amendment which has been suggested by the committee may be considered without being subject to a point of order.

These are immigration bills and will be fully explained by the Immigration Committee when being considered.

Is any time desired in opposition to the rule?

Mr. O'CONNOR of New York. Yes; I would like to have some time.

Mr. MICHENER. How much?

Mr. O'CONNOR of New York. Fifteen minutes.

Mr. MICHENER. I yield to the gentleman from New York 15 minutes.

Mr. O'CONNOR of New York. Mr. Speaker and gentlemen of the House, it has been said around this Chamber that these three bills are perfectly innocent and do not involve much controversy. The Rules Committee has reported this rule for consideration of these three bills at this short session of Congress. Some of us who shall listen to the debate on the bills will be anxious to find out just what emergency prompted their being brought in under a rule when so much important legislation is still pending in this short session.

During the six years that I have been in the House, and during all that time I have been on the Rules Committee, I have always had grave doubt about any immigration bill which was presented to this House. It is not so much the particular provisions of any immigration bill as it is the spirit behind the bill with which I am deeply concerned. Here to-day I want to discuss that spirit which I believe pervades our country to an alarming extent, and I want to discuss it without any thought of the past or recent events. I approach it looking to my country's future.

I believe that there are many people in this country to-day who fear that these United States of ours is the most intolerant, narrow-minded nation on the globe. I am not going to use any bromides about loving my country. That is the gratuitous mouthing of a demagogue. If I think my country is wrong, I propose to criticize it in its own citadel. I will defend it against attack from without, but I reserve the right to criticize it from within. I fear there is a spirit pervading our country to-day reflected in these immigration bills that is a menace to the country—a spirit of intolerance and bigotry not only to religions but to races.

Take the first bill, relating to the deportation of alien criminals. Has anybody ever said anything here about establishing a penal colony for the deportation of citizen criminals and putting out of the country the criminal citizen?

Take another bill before us to-day, the Box bill, relating to immigrants coming over our borders. It represents a spirit of superior intolerance to our neighbors on the north and south.

Oh, I do not like the spirit behind all these measures. There seems to be a spirit of bigotry and intolerance in America directed at the races of the rest of the world that surely is un-American. There are certain people in our country who believe that no other race on the face of the globe can be compared in education, in culture, in respectability to the inhabitants of the United States.

Let me state here, gentlemen, in order to say anything sensational but to bring the truth forcibly before this body: Take a railroad train and go through the South, through the West, through the North, and in the outlying sections of the country look at what we call our own people, who have not had the opportunities of the people in the big cities. You will see American people of the Nordic races, you will see people whose forefathers were here 300 years ago, but you will see them in the lowest state of civilization. Is that the type to which you refer when you speak of the "American blood" in America? Yes; you will see them in rags and tatters; you will see them unkempt, uncultured, uneducated, and uncouth.

Then I suggest you take an automobile and ride through the so-called foreign sections of the big cities and see these foreign people whom you hate so vehemently. Look at their children going to school in droves, seeking every opportunity for education, eager to acquire and to assimilate all the customs and habits of our country. See them going through the grammar schools, the high schools, to the colleges, from Harvard to Stanford, eager to become a part of America and of its institutions.

Let me make this assertion here, after due consideration, that I believe that the foreigners in this country to-day on the whole furnish better material for citizenship than many of the so-called American types living in outlying sections of the country.

Oh, I do not consider that an attack on my country. Every one of these bills is directed at one or a few particular races. Why is that spirit rampant in America? It is daily commented upon in colleges in nearly every issue of the current magazines.

How long can demagogues in all political parties continue to preach this doctrine of saying "America for Americans only" and further foment this vindictive intolerance evidenced by these bills? It surely must result in damage to our country. It is a spirit of vindictiveness against anybody whose ancestors were not born here 300 years ago. I do not care what its effect is in elections, but I do care what effect it is going to have on our country in the future.

Where is this doctrine being preached? On the political stumps by demagogues. But, more than that, this doctrine of intolerance of "American" narrow-mindedness is being preached in the pulpits of our churches, from the rostrums of small communities where people go to learn the thought of their communities. This doctrine is being propagated through the country by what I believe to be an ignorant, uneducated, cleric party, and I have no hesitation in saying it.

I further have no hesitation in saying that the preachers of intolerance, and I am talking principally about intolerance to races, are the most uneducated of any profession in America; that the clergy of America are the least educated of any profession in Amerien, but they have the most powerful influence of any profession in America. They get a smattering of general knowledge, a little ecclesiastical training, but no broad vision, and then they go into a community and try to shape the thought of that community and preach that the Italian, the Jew, the Irish, the German are not fit to live in America. That is the danger to America. The country is flooded I might say with "Elmer Gantrys" preaching an un-American doctrine. Many Members are as afraid of an immigration bill as they are of a prohibition bill. They fear what will be said about them at home if they take a position in opposition to them. The preachers will attack them.

It is not a bad rule in approaching legislation to "beware of the Greeks bearing gifts," to see what spirit is behind the legislation.

These three bills are not needed now, but they will go to credit some men here in their districts with having furthered the cause of intolerance. I am as much interested in this question of restrictive immigration as anybody else, but I do not want America to become so narrow that it feels that these people of the Old World can not furnish something to this country. They have, in fact, furnished a great deal it has to-day. This snug nationalism is the greatest snobbishness that any nation could wear on its countenance in facing the rest of the world. Much we have in this country to-day we owe to the immigrants who came here from the Old World. Everyone knows the spirit behind the 1924 immigration law, directed principally at two peoples, the Italians and the Jews. That spirit of the Ku-Klux Klan has continued to persist. The same spirit I believe pervades these three bills here to-day—the sanctimonious, self-opinionated conceit that nobody else except the natural-born American, whatever he may be, is fitted to enjoy our present-day America.

I am not so much interested for the moment in what happens in immigration legislation. Perhaps immigration should be regulated. Perhaps we should close the doors. But I do detest the giving of false economic reasons to disguise intolerance. I regret to see labor deceived and deluded by false eco-

nomic reasons advanced, when I feel confident that the spirit behind the whole question is mean and contemptible and, worst of all, un-American. [Applause.]

### REGULATING THE HEALING ART IN THE DISTRICT OF COLUMBIA

Mr. ZIHLMAN. Mr. Speaker, I ask unanimous consent to take from the Speaker's table the bill (S. 3936) to regulate the practice of the healing art, to protect the public health in the District of Columbia, insist on the House amendments, and agree to the conference asked by the Senate.

The SPEAKER. The gentleman from Maryland asks unanimous consent to take from the Speaker's table the bill (S. 3936) to regulate the practice of the healing art in the District of Columbia, insist on the House amendments, and agree to the conference asked by the Senate. Is there objection?

Mr. ALMON. Mr. Speaker, reserving the right to object, I want to ask the gentleman from Maryland in reference to the House amendment known as the Johnson amendment, whether he will bring that back to the House, if necessary, in order to have it incorporated in the bill as a part of the bill, and give the House an opportunity to vote upon it? The amendment was adopted by a comparatively small majority. I do not think it would be fair to the House for the House conferees to recede without giving the House an opportunity to vote upon it.

Mr. ZIHLMAN. Mr. Speaker, there are only two amendments. It is true there are three, but one of them is a corrective amendment of the text. Necessarily, the conference report would come back to the House for action.

Mr. ALMON. But if the conferees receded on this amendment and brought back the conference report, we would have to vote the conference report up or down.

Mr. ZIHLMAN. Mr. Speaker, I do not understand what the gentleman desires.

Mr. ALMON. I mean this: Rather than recede from the House amendment known as the Johnson amendment, that the gentleman give the House an opportunity to vote on it before receding. It is a very easy question to answer yes or no.

Mr. ZIHLMAN. I do not see how the conferees could agree to bring it back for further instructions. We will bring back the conference report.

Mr. ALMON. I think the gentleman should agree to give the House an opportunity to vote upon it again rather than to let it go out.

Mr. ZIHLMAN. The gentleman presumes that the conferees are going to let that go out. The conferees are bound by the action of the House and they represent the will of the House. We will insist upon the House amendments and my unanimous-consent request carried with it the provision that we insist on the House amendments.

Mr. ALMON. I hope that the House conferees will insist on the Johnson amendment.

Mr. ZIHLMAN. We hope to bring the bill back with the House amendments agreed to by the Senate.

The SPEAKER. Is there objection to the request of the gentleman from Maryland?

There was no objection.

The Chair appointed the following conferees: Mr. ZIHLMAN, Mr. BOWMAN, and Mr. BLANTON.

### IMMIGRATION

Mr. SABATH. Mr. Speaker, I desire to propound an inquiry to the gentleman from Michigan. Does this rule provide that one hour of general debate shall be on each of these bills or one hour on all the bills combined?

Mr. MICHENER. On each bill.

Mr. SABATH. That is the information I desired.

Mr. MICHENER. Mr. Speaker, there being no further debate on the rule, I move the previous question.

The previous question was ordered.

The question was taken, and the resolution was agreed to.

### TEMPORARY ADMISSION OF ALIENS TO THE UNITED STATES

Mr. VINCENT of Michigan. Mr. Speaker, under the rule just adopted by direction of the Committee on Immigration and Naturalization, I call up the bill H. R. 16927 for consideration.

The SPEAKER. The gentleman from Michigan calls up the bill which the Clerk will report.

The Clerk read as follows:

A bill (H. R. 16927) to clarify the law relating to the temporary admission of aliens to the United States

*Be it enacted, etc.,* That section 3 of the immigration act of 1924 (U. S. C. title 8, sec. 203) is amended by inserting "(a)" after the section number and by adding at the end of the section a new subdivision to read as follows:

"(b) For the purposes of clause (2) of subdivision (a) of this section no alien shall be considered as visiting the United States temporarily as a tourist or temporarily for business or pleasure (1) if he is coming

under an agreement already made, express or implied, to engage in or resume employment by a person in the United States, or employment in any business or industry of the United States whether or not the employer is a citizen or resident of the United States, unless in either case he would, if an immigrant subject to the contract-labor provisions of the immigration act of 1917, come within the specific exemptions of such provisions, or (2) if he is coming to seek employment in the United States."

Mr. VINCENT of Michigan. Mr. Speaker, will the Speaker call my attention when I have used 10 minutes?

Gentlemen of the House, this bill is not for the purpose of making any drastic change in the immigration law. It is for the purpose of making certain and clear the intent of the Congress with respect to one point of the immigration law of 1924, in view of certain court decisions which the committee believes have departed from the real intent of the Congress. When the immigration law of 1924 was adopted it was found necessary to permit certain persons to enter the United States as nonimmigrants. Those classes of persons were clearly set forth in the immigration law.

The classes of nonimmigrants, that is, persons who were not to be treated as immigrants at all, but who could come into the United States temporarily because they were not immigrants, were set forth in section 3 of the immigration law, and they are made up of six different classes of persons. The first class is the government official, his family, attendants, servants, and employees. That is, those who come here to represent another country as officials of that country are not immigrants to this country. Second, an alien visiting the United States temporarily as a tourist or temporarily for business or pleasure. Those people were not to be considered as immigrants. They could come in for a brief limited period and then depart without undergoing the rules and regulations of quota, and so forth, that govern immigrants. The third class was the alien in continuous transit through the United States. That is, if a man came from a foreign country and landed at New York, but his destination was Montreal, Canada, he could pass through the United States without becoming an immigrant to the United States. Fourth, an alien lawfully admitted to the United States and who later goes in transit from one part of the United States to another through a foreign contiguous territory. That is, an immigrant admitted lawfully to this country, living in Buffalo, but passing to Chicago across the lower part of Canada, did not become an immigrant again when reaching the United States at Detroit, and so forth. Now trouble has arisen with respect to the second class that I named, that is, the alien visiting the United States temporarily as a tourist or temporarily for business or pleasure. Certain persons have come to the borders of the United States and claimed the protection of this clause 2 as nonimmigrants on the ground that they were intending temporarily to enter the United States for business. That business in each of these instances has consisted of this, either going into the United States to engage in a job of labor or some employment for which they have a contract, or, second, going into the United States to hunt for a job as a laboring man, or in some such employment. It was never the thought of the Committee on Immigration and Naturalization that a person coming into the United States to take a job, or to go about the country hunting for a job, was engaged in business. The intention the committee had is clearly expressed in its debates, and that was that we should not raise around the United States a Chinese wall through which business men, engaged in trade and having one part of such trade in a foreign country and the other part in this country—international commerce—ought not to be deprived of entering the United States temporarily for the purpose of carrying on a legitimate, substantial business which had, as I have said, a part of its situs in this country and part in another country.

Mr. MORTON D. HULL. Mr. Speaker, will the gentleman yield there for a question?

Mr. VINCENT of Michigan. Certainly.

Mr. MORTON D. HULL. Does this affect those coming into this country as teachers in schools and colleges and preachers?

Mr. VINCENT of Michigan. This provision has no reference to them. That is covered by another provision of the immigration act.

Now, then, a short time ago certain persons entered the country first at Detroit and then at Buffalo, and when they were excluded from entering they brought suit in the Federal court on the ground that they were entering under this clause 2 of this provision. They contended that they were entering temporarily for business. That "business" consisted in many of these cases of coming into the United States to take a job as a laboring man, a job that had already been contracted for, and the court, in the second circuit court of the United States, Judge Manton, ruled that such person entering the United

The Clerk read as follows:

Mr. Hawley with Mr. Garner of Texas.
Mr. Treadway with Mr. Rainey.
Mr. Timberlake with Mr. Hull of Tennessee.
Mr. Bacharach with Mr. Watson.
Mr. Crowther with Mr. Ramseyer.
Mr. Estep with Mr. McLaughlin.

The result of the vote was announced as above recorded.

The SPEAKER. The question is, Shall the bill pass?

The question was taken, and the bill was passed.

On motion of Mr. JOHNSON of Washington, a motion to reconsider the vote by which the bill was passed was laid on the table.

## THE RETIREMENT AND RECLASSIFICATION BILLS

Mr. HUDSPETH. Mr. Speaker, I ask unanimous consent to proceed out of order for three minutes.

The SPEAKER. The gentleman from Texas asks unanimous consent to proceed out of order for three minutes. Is there objection?

There was no objection.

Mr. HUDSPETH. Mr. Speaker and gentlemen of the House, I feel it of the utmost importance to call to the attention of the House at this time the necessity for passing the Dale-Lehlbach retirement bill. I have aided in securing a rule for consideration of this measure, which rule has been in the possession of the chairman of the Rules Committee for quite a while.

This act increases the maximum retirement pay to $1,200 a year and the average allowance to $890. The present maximum is $1,000, and the average pay around $760. And in many cases employees receive less than $100 yearly.

This fund comes largely out of the salaries of the employees—in fact, practically all of it. So, why should Congress object to passing a meritorious measure, which means the caring for aged employees of the Federal Government, when it comes out of their own pockets?

The session is approaching its close. There is no question that if this bill should be placed before the House at the present time it would pass by a vote of three-fourths of the membership.

I also wish to draw attention of the Members of the House to the reclassification act, passed by the Senate, known as the Brookhart bill and introduced in the House by Mr. CELLER, of New York.

And I will further bring to the attention of the Members of the House the fact that under the Welch bill, as administered by the Personnel Classification Board, from my personal knowledge and through information gained in discussing the matter with employees here, in my home city of El Paso, and elsewhere, that the ones receiving the lower pay have not been benefited.

I do not object, Mr. Speaker and gentlemen, to the fact that increases were granted under the Welch Act. I think this was very necessary and timely. But I do wish to impress upon you the fact that those in the lower grades, who I thought at the time of the passage of the act, would receive substantial increases, have not received them under the classification made by this board.

Furthermore, the Comptroller General construes this act in a different way from what Congress intended. And those whom we intended should get the real benefit, or a majority of the Federal employes, I might say, have not received it, as the act has been construed and administered.

Everyone recognizes at the present time the great increase in the cost of living. And since I have been a Member of Congress there has been at least 100 per cent increase in the cost of living. But the increase in salaries has not been commensurate with, by any means, or in proportion to the increase in the necessaries of life.

"The laborer is worthy of his hire." The Federal Government is a big corporation, and it has as faithful employees as we have in this great country. Therefore I especially urge that these bills be taken up at the earliest possible moment and placed before the House, where there is no question they will pass by a large majority.

I especially urge the Republican steering committee and the chairman of the Rules Committee, who have the power to bring these measures up and permit the Members who earnestly desire to have these increases made, to give them opportunity to vote upon them, so that they may be enacted at the other end of the Capitol and reach the President in time for his signature before the final adjournment on the 4th of March.

I recently signed a request for the bringing up of these measures and am informed by the gentlemen who circulated this petition that over 300 names of Members of the House had been secured requesting immediate consideration. This shows the temper of the House and should convince the "powers that be" of the great importance of considering this legislation at the earliest possible time. [Applause.]

## DEPORTATION OF ALIENS

Mr. JOHNSON of Washington. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the state of the Union for the consideration of the bill (S. 5094) making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law.

The motion was agreed to.

Accordingly the House resolved itself into the Committee of the Whole House on the state of the Union for the consideration of the bill S. 5094, with Mr. BACON in the chair.

The Clerk read the title of the bill.

Mr. JOHNSON of Washington. Mr. Chairman, I ask unanimous consent that the reading of the bill be dispensed with.

The CHAIRMAN. Is there objection to the request of the gentleman from Washington?

There was no objection.

Mr. JOHNSON of Washington. Mr. Chairman, this bill is an abridgement of a bill relating to deportation which passed the House almost unanimously in the last Congress and in the Congress before that. The bill in much larger form was reported from the committee to this House a year ago in January, but the time now is so short between now and adjournment it has been decided by the committee to report out a deportation bill in shorter form.

The committee has given the bill, in case it becomes a law, a title so that the act may be known as the undesirable aliens act of 1929.

The bill has been written with the greatest care, without malice or feeling of any kind, and is designed for the protection of the United States, and is intended to reach only the most dangerous classes of criminals and those aliens who smuggle or who assist in smuggling other aliens into the United States. This is the bill you have been asking for. [Applause.]

Mr. SCHAFER. Will the gentleman yield?

Mr. JOHNSON of Washington. In just a minute. Wait until I have finished my statement.

The committee spent some time in endeavoring to draft a paragraph that would reach the alien gunman, and at a meeting of the committee this morning the reporting of an amendment including one more classification was authorized, reading as follows:

(8) An alien who is convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, for which he is sentenced to imprisonment for a term of six months or more; or who, having been convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, is thereafter convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, regardless of the sentence in either case. This subsection shall apply only in the case of offenses committed after the enactment of this act.

In other words, in respect of this line of cases the committee, if we can enact this into law, reaches down to less than one year's conviction and recognizes a conviction of six months in a court of record, or two convictions of the same person regardless of the length of time.

Quite a number of the States have very stringent laws against the carrying of guns. Most of them require permits, and several States have laws with regard to the carrying of guns by aliens, and in some States aliens are required also to have permits.

I am hopeful we can get right along with the bill. It has been abridged to the last degree and will be effective, and now includes this additional provision.

Mr. HUDSON. Will the gentleman yield?

Mr. JOHNSON of Washington. Wait until I have rounded out my statement.

Mr. HUDSON. Will the gentleman yield with respect to the language describing the bomb?

Mr. JOHNSON of Washington. I just read it. We can not describe bombs and hatchets and the size of bombs, and all that sort of thing, in respect of the enactment of a bill to apply to persons who have been convicted. We use the words "explosive bombs." The courts will take care of the description according to State laws.

This language is the key to the bill:

That the following aliens shall, upon warrant of the Secretary of Labor, be taken into custody and deported in the manner provided in sections 19 and 20 of the immigration act of 1917 (U. S. C. title 8, secs.

155, 156), if the Secretary of Labor, after hearing, finds that such aliens are undesirable residents of the United States.

Now, gentlemen must understand that sections 19 and 20 of the basic immigration act of 1917 still stand, providing for deportation, and that every alien may have a lawyer and have a defense. That applies to two or three classes now—the procurer type and one or two others. This bill extends it to the narcotic type, the narcotic peddler, and also to those who would smuggle and harbor aliens. I think that makes it clear. They have the process and opportunity of defense, and in addition I want to say that all cases of deportation not mentioned in this particular act remain in the law of 1917.

Mr. TAYLOR of Tennessee. Will the gentleman yield?

Mr. JOHNSON of Washington. I yield.

Mr. TAYLOR of Tennessee. I regard this as a very meritorious bill. It has already passed the Senate, I believe?

Mr. JOHNSON of Washington. Part of the text of the bill has passed the Senate, but we have substituted a deportation bill.

Mr. TAYLOR of Tennessee. I wondered if this amendment was adopted it would not jeopardize the bill?

Mr. JOHNSON of Washington. I think not; this Senate proposal really related to aliens deported and returning to the United States. I think that we can get something out of this that the people want.

Mr. UNDERHILL. Will the gentleman yield?

Mr. JOHNSON of Washington. I yield.

Mr. UNDERHILL. Will the gentleman state why we can not make this retroactive?

Mr. JOHNSON of Washington. I have a doubt as to the policy of making laws retroactive.

Mr. UNDERHILL. If we could go back to January 1 and catch that bunch that did the shooting the other day in Chicago——

Mr. JOHNSON of Washington. I am not sure they are all aliens.

In regard to a retroactive clause, it is interesting to note that many of the provisions in the large deportation bill were brought out a year ago in the past. Yet some of the cases provided for deportation exist now only in a small degree. You must remember that there was a time limit—five years in most cases and three years in some. There was no limit to cover the worst criminals. When your committee undertook five years ago to work out a deportation law there were a great many dependent aliens in insane institutions—decrepit and paupers. The law was not passed and so time limit ran in nearly all of the cases. The restrictive immigration act went into effect on July 1, 1924, so it will be five years next July, and on July 1 next the time limit will run out in nearly all classes.

Mr. COCHRAN of Missouri. Will the gentleman yield?

Mr. JOHNSON of Washington. I yield.

Mr. COCHRAN of Missouri. My attention was called to the cases of four aliens ordered deported confined in an institution in St. Louis where the State Department was unable to secure from the foreign government their passports. How are you going to get such people deported if the foreign government will not issue the passports?

Mr. JOHNSON of Washington. We have the same trouble in the United States, for we as a government decline to take back our insane aliens from Canada.

Mr. COCHRAN of Missouri. Then what is the use of passing this bill if the foreign governments will not grant the passports?

Mr. JOHNSON of Washington. This reaches another type entirely.

Mr. SABATH. Mr. Chairman and gentlemen of the House, I am pleased to be in a position to say that it begins to look as if I have been of some service to the House and to the country. I say this because I recall that when some four years ago the House was about to pass a deportation bill I called attention to the fact that it contained many glaring defects. I pointed out here at that time that some of its provisions were most unfortunate, unfair, and utterly indefensible. That I was justified in my criticism was demonstrated later by the refusal of the Senate to enact it into law.

Again, a year ago, the House passed a deportation bill, not as fierce, not quite as bad, as the one we passed in 1926, but still a very vicious bill which again failed, and properly so, to pass the Senate.

Therefore, I am indeed pleased that to-day the committee submits for your consideration a deportation bill which is not as vicious, which is not as bad, and which I am hopeful that I may be able to vote for, and will vote for, if a few amendments are agreed to, and which amendments I feel that you gentlemen will vote for when they are submitted to the House.

Now, with a view of enlightening some of you gentlemen who have been made to believe that in years gone by we have had no deportation legislation, I want to read to you, while I have a chance, what the present law provides.

I desire to do this so that in the future you will not be carried away on legislation that is brought up on the floor of the House merely because some unreasonable people insist upon its enactment. I know that most of you, due to the large amount of work you have, and the many duties which you must perform, are unable to familiarize yourselves with all of the laws. Therefore, at this time I shall read what the present deportation law actually is. Section 19 provides:

SEC. 19. That at any time within five years after entry, any alien who at the time of entry was a member of one or more of the classes excluded by law; any alien who shall have entered or who shall be found in the United States in violation of this act, or in violation of any other law of the United States; any alien who at any time after entry shall be found advocating or teaching the unlawful destruction of property, or advocating or teaching anarchy, or the overthrow by force or violence of the Government of the United States or of all forms of law or the assassination of public officials; any alien who within five years after entry becomes a public charge from causes not affirmatively shown to have arisen subsequent to landing; except as hereinafter provided, any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States, or who is hereafter sentenced more than once to such a term of imprisonment because of conviction in this country of any crime involving moral turpitude, committed at any time after entry; any alien who shall be found an inmate of or connected with the management of a house of prostitution or practicing prostitution after such alien shall have entered the United States, or who shall receive, share in, or derive benefit from any part of the earnings of any prostitute; any alien who manages or is employed by, in, or in connection with any house of prostitution or music or dance hall or other place of amusement or resort habitually frequented by prostitutes, or where prostitutes gather, or who in any way assists any prostitute or protects or promises to protect from arrest any prostitute; any alien who shall import or attempt to import any person for the purpose of prostitution or for any other immoral purpose; any alien who, after being excluded and deported or arrested and deported as a prostitute, or as a procurer, or as having been connected with the business of prostitution or importation for prostitution or other immoral purposes in any of the ways hereinbefore specified, shall return to and enter the United States; any alien convicted and imprisoned for a violation of any of the provisions of section four hereof; any alien who was convicted, or who admits the commission, prior to entry, of a felony or other crime or misdemeanor involving moral turpitude; at any time within three years after entry, any alien who shall have entered the United States by water at any time or place other than as designated by immigration officials, or by land at any place other than one designated as a port of entry for aliens by the Commissioner General of Immigration, or at any time not designated by immigration officials, or who enters without inspection, shall, upon the warrant of the Secretary of Labor, be taken into custody and deported.

I have read to you the deportation provision of our law which has been on the statute books for over 10 years, under which to my mind you can deport almost anybody, at least anybody and everybody who is guilty of any crime. But in that law there were limitations as to when deportations must take place in instances of certain offenses. It will be noted that the law now requires that deportation must take place within three or five years in certain instances. That, however, does not apply to the provision that I had written into the law, namely, the deportation of violators of the white-slave traffic, under which they can be deported at any and all times without any limitation of time. The bills that the committee reported, and the House voted for, at the last session and the session before last, merely rectied the present laws and eliminated the limitations that are placed in it, in respect to some of the offenses mentioned in the 1917 act. Therefore, as I say, I am mighty pleased to-day to know that the committee has finally, after sobering up and giving the matter due consideration, submitted a report and recommended a bill which is not as harsh, not as unreasonable, as those bills which you gentlemen have twice voted for almost unanimously in this House, due to the fact that you did not have the information that you should have had before voting on such important legislation.

Mr. EVANS of California. Mr. Chairman, will the gentleman yield?

Mr. SABATH. Yes.

Mr. EVANS of California. Will the gentleman point out to us the difference between the old deportation law and this bill under consideration?

Mr. SABATH. I do not think that I have the time, but I will say that this bill eliminates the time limit in certain offenses, so that under this law—and that is one of the objections I still have—a man may be deported for a minor offense—yes, even for misdemeanors committed 20 or 30 years ago. The gentleman, I take it, is a lawyer; and he knows that in every State in the Union we have a statute of limitation which runs, in most of States, three years, and in some of them five years, which is the time limit within which a man guilty of an offense, even a crime, can be prosecuted. But in this bill we completely eliminate that time limit, and a man might be deported, as I stated, 10, yes, 20, years after the offense has been committed. That provision in relation to some minor offenses is, I think, cruel, un-American, unwise, and unjustifiable, and I feel it should be amended. I favor the deportation of a real criminal at any and all times, but not one guilty of only a minor infraction of law.

Mr. RUTHERFORD. Mr. Chairman, will the gentleman yield?

Mr. SABATH. Yes.

Mr. RUTHERFORD. The gentleman stated a moment ago that the committee had sobered. Does the gentleman wish to leave the impression that it was drunk on power?

Mr. SABATH. I know that the gentlemen of my committee do not get drunk on anything else than power. Of course, I am not at all times with them, and I do not know whether they imbibe anything other than the power that has been granted to them as members of that committee. I certainly do not wish to leave any inference that the committee, or any member of it, has been drunk on anything other than power. Proviso 3 and proviso 4 in this bill, I think, should be amended. I hope you gentlemen who are here will realize that I am not seeking anything beyond fairness and justice, that I favor deportation, and that I always did, of any criminal and, again, I am obliged to congratulate myself and pat myself on the back because the committee has finally agreed with me and has brought in a provision under which we will be able to deport the criminal gunman. In the acts of 1925 and 1926, and in the last year's act, that provision was not in the deportation bill. I then introduced a bill which provided directly for the summary deportation of gunmen. I have no sympathy, and never did have any, with any real criminal, but I do have sympathy for an unfortunate alien who, through no fault of his, finds himself an inmate in an institution, such as a hospital or public sanitarium, where he has been sent because of injury that he has received through no fault of his own, and who, because of that fact, when found to be receiving treatment in such an institution is designated a public charge, though he did nothing to bring it upon himself, and under our laws is ordered deported because he has not enough funds to be taken care of or treated in a private hospital or sanitarium. I have always favored the deportation of every real criminal.

I have no sympathy with those who deliberately come here in violation of the law, trusting to outwit our officials, and I repeat that they should be deported. Therefore, I hope to-day to be able to support a deportation bill even though it may go a little further than I think it should, providing it may contain provisions which I feel of interest to our Nation. I say, I am hopeful that I may be able to vote for it, providing, however, you will help me to justify my vote for it by eliminating some few unjustifiable provisions which are both unreasonable and unconstitutional.

In addition to the amendment which I offer, I have another amendment which I desire to offer and will offer when the proper time comes, and that provides for the deportation of anyone, not only the gunman convicted in court of record, but I will go with the committee a step farther. I believe we should deport every gunman after he has been found guilty the second time of having in his possession any gun, pistol, revolver, or explosive bomb. It should not be necessary that he should be convicted in a court of record, but it should suffice that he has been convicted in any court. I repeat that I am not, never was, and never will be in favor of anything helpful to any alien criminal. I am against them; I want them out. I want the alien here to behave himself and demonstrate that he is deserving of our hospitality. On the other hand, gentlemen, I want to ask of you that in the future when this question comes up do not look upon this question as involving principally the alien, but as having reference chiefly to the criminal.

The number of the criminal aliens is small, indeed, in comparison; the percentage is much lower in fact than that among American-born or American citizens.

These gunmen that you read about are not aliens. They are not men who came here in the last 5, 8, 10, or 15 years and of the so-called new immigration. A majority are men who are born in this country; some are of foreign parentage.

A large number of men who are studying the present crime wave believe that the late war is responsible for the prevalent crime.

The war undoubtedly taught men to hold human life cheap; it imbued men with the killing instinct. Civilization is going to have to pay the price for a certain period, until this killing instinct subsides.

However, anyone who has studied the conditions can not deny that prohibition, to a far greater extent than the war, is responsible for the present wave of crime.

In this I am borne out by every man and woman, and every organization that has investigated and studied conditions. Therefore, gentlemen, the sooner we modify or change the present prohibition law the sooner we will be able to reduce, and I hope, eliminate a great measure of the existing deplorable conditions. Such action, and such action alone, in my judgment, will tend to arrest the ever-increasing disregard of every other law. Prohibition has been responsible for more crime than anything else that has occurred in America in a century.

Therefore I am indeed grateful that the committee has agreed to embody in this bill an amendment which will bring about summary deportation of any alien guilty of carrying concealed weapons. I concede it is a very stringent provision, but I feel it is absolutely necessary, not because it will bring about any great number of aliens for this offense, but it will prove beyond doubt that only a very few, if any, of these gunmen are aliens, which will be demonstrated within a short space of time after this provision goes into effect and will stop the continuous attacks of those who are trying to unload all the blame for all crime on the shoulders of the immigrant classes.

The amendment referred to which I shall offer at the proper time and which I hope will be adopted, reads as follows:

(8) An alien who is convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, for which he is sentenced to imprisonment for a term of six months or more; or who, having been convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, is thereafter convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, regardless of the sentence in either case. This subsection shall apply only in the case of offenses committed after the enactment of this act.

In this connection, gentlemen of the House, I desire to state that in the following additional amendment I believe I provide a manner of getting at a real solution of this problem of the alien gunman in a more far-reaching and practical way than by any method that has heretofore been suggested here:

An alien who has no lawful and visible means of livelihood, who has been convicted for the second time as a vagrant, if it appears that in each case, at the time of his arrest he was carrying on his person or in a vehicle, a concealed pistol, revolver, gun, or bomb.

Mr. GREEN rose.

Mr. SABATH. I had forgotten the gentleman. I am glad——

Mr. GREEN. Will the gentleman yield?

Mr. SABATH. I will.

Mr. GREEN. I wonder if the gentleman has the figures showing exactly what percentage of the criminals of the country are aliens and what percentage are Americans?

Mr. SABATH. Well, I will give that information in a minute.

Mr. GREEN. And also give to the House what percentage of our population is foreign born.

Mr. SABATH. I will try to give the gentleman and the House all the information I possibly can within the time allotted to me. I am glad to see the gentleman rise and ask for information for I know he can use a lot of information and the information probably will be beneficial to him I hope in the future. [Laughter.] I do not know of anybody who can absorb more information than the gentleman.

Mr. GREEN. And I do not know of any gentleman who can come as near not giving information as the gentleman. Will the gentleman answer the question?

Mr. SABATH. I shall again prove to you and to the House that you are again wrong in your statement, as I will give you facts and figures that will make you dizzy, and I hope that it will do you some good.

Mr. GREEN. Answer the question.

Mr. SABATH. And be absorbed by you and subsequently utilized in the right direction.

The gentleman from Florida requested information, and I must not disappoint him. I wish to submit some information relative to his own State of Florida. Florida had an estimated population in 1925 of 1,253,957, of which 28,571 are listed by the United States Census Bureau as aliens, and I imagine a very, very small proportion of that number are Europeans and a very large proportion Cubans and from the West Indies.

Florida, being part of the States, is under prohibition along with the rest of us, and the records show the people down there are inclined to violate the prohibition laws very much as they do elsewhere. If the aliens are the only ones violating the Volstead Act, they must be kept pretty busy. The records show that during the year ending June 30, 1928, the number of " distilleries " seized in the State of Florida numbered 820, while of lesser apparatus for violating the prohibition laws, there were confiscated in that State, in addition, 581 individual stills, 850 still worms (whatever they are), and 20,981 " fermenters." So that it is evident that someone down in the gentleman's State does enjoy a drink. I read recently in the newspapers a statement by some public official to the effect that 100 stills are operating in the Nation as a whole for every 1 destroyed, and if this estimate holds good as to Florida it becomes evident that more good " likker " is being produced in the good and great State of Florida than can probably be consumed by the aliens without a little assistance now and then from the balance of the Florida citizenship.

I do not wish to be understood as assailing Florida or Floridas. Not at all. I sympathize with Florida. Not only did she lose in a single year all that valuable paraphernalia for the manufacture of the celebrated Florida " hootch " or " white mule," but her citizens were forced to withstand the agonizing ordeal of standing helplessly by and watching the authorities seize, lay violate hands upon, and destroy 36,595 gallons of the finished product of the still, to say nothing of 1,097,287 gallons of the still unfinished product, otherwise known as " mash." Visualize it, contemplate it, weep over it, you who have hearts, the " makings " of a million grand and glorious feelings heartlessly and ruthlessly wasted!

One more reference as to the prohibition and Florida, and then I intend to let Florida alone. In addition to the output of Florida's distilleries, stills, still worms, and that Florida handy household convenience, the " fermenter," it is said that enough red liquor is smuggled into Florida ports from Cuba and the Bahamas every year to float one of those cruisers of the type recently authorized by Congress.

Adjoining Florida is the " bone-dry " State of Georgia. Georgia in 1925 had an estimated population nearly three times that of Florida, but only one-sixth as many aliens, 4,734 against Florida's 28,571. But—shades of William D. Upshaw—the year ending June 30, 1928, witnessed the destruction of more than twice as many stills, and the seizure of more than twice as much mash, in which so much hope and anticipation is centered, than occurred even in Florida.

To recapitulate, the year's casualties for " bone-dry " Georgia were: 1,919 distilleries, 1,484 stills, 934 still worms, 19,370 fermenters, 33,351 gallons of spirits, 2,456,067 gallons of mash—all gone to smash! And the number of aliens affirmed to be in Georgia was only 4,734 out of its total population of 3,058,260! Only one-sixth as many aliens and more than twice as much law violation? Is further comment necessary?

If the estimate previously cited, of 100 stills operating for each one discovered and seized holds good for Georgia, the " aliens " down there have no need of any worry on our part. They are no doubt still able to get a drink and this notwithstanding the statement on the part of its Representatives.

I have no personal animus whatever in this matter, and am not pretending that Florida or Georgia is any worse or any better or any drier or any wetter than any other State in the Union. As a matter of fact, they are not. I could cite similar figures about most any other State in prohibition America. For the farce is nation-wide.

But since I have been discussing those two States I wish to add, as a mere matter of postscript, a little further data to show which way the wind is blowing in a couple of the leading cities of Florida and Georgia.

Arrests for drunkenness in Jacksonville, Fla., for the year 1921 numbered 995, but for 1927 the number was 3,109 more than three times as many as during 1921.

Arrests for the same cause in Atlanta, Ga., in 1921 numbered 4,491, as against 9,806 in 1927.

Similar statistics could be cited for most cities in the United States, and it is a curious fact that the increase of arrests for drunkenness appears markedly greater in the former so-called dry States than in the former so-called wet States.

Another peculiar fact revealed by the official report of the Commissioner of Prohibition is that some of the States which send the leading dry crusaders to Congress are greater violators of the prohibition law, in proportion to population, than some of the former so-called wet States. Much is said, for instance, about the " wetness " of my own State, Illinois. Now, I frankly admit the prohibition law is violated there, but you seldom hear the Representatives of the " dry " States doing likewise. Yet

the official report of the United States Commissioner of Prohibition shows that the number of arrests for violations of the prohibition amendment is greater per capita in the " dry " South, which produces our leading " dry " advocates, than in " wet " Illinois. The following figures are all taken from the report indicated, covering the year ending June 30, 1928:

| State | Population (estimated), 1925 | Distilleries seized | Stills seized | Still worms seized | Fermenters seized | Spirits seized | Mash seized |
|---|---|---|---|---|---|---|---|
| | | | | | | Gallons | Gallons |
| Alabama | 2,467,190 | 414 | 308 | 3 | 4,298 | 8,267 | 577,834 |
| Florida | 1,253,057 | 820 | 581 | 850 | 20,981 | 36,595 | 1,097,287 |
| Georgia | 3,058,260 | 1,919 | 1,484 | 934 | 19,370 | 33,351 | 2,456,067 |
| Total | 6,779,407 | 3,153 | 2,373 | 1,787 | 44,658 | 78,154 | 3,930,988 |
| Illinois | 6,964,950 | 330 | 935 | 104 | 9,431 | 75,193 | 1,618,234 |

This table and figures show that there are ten times as many distilleries, three times as many stills, nine times as many still worms, five times as many fermenters, and over twice the number of gallons of mash seized in the three States with a population of 200,000 less than that of the State of Illinois. And this notwithstanding that the laws are not enforced in these dry States to the extent that they are in my State.

Now, I hope that in the future the gentleman from Florida, who believes in law and order and decency and morality, will help me and others to bring about an amendment or modification of the prohibition law, so that we can eliminate the present wave of crime that is prevalent from one section of the country to the other solely as a result of prohibition.

Mr. GREEN. I will be glad to help the gentleman if his committee will bring out a bill that will deport every alien who violates the prohibition law.

Mr. SABATH. Here I have a report from the Commissioner of Immigration for the year 1928. On page 154 of this highly informative document he will find, in Table No. 56, the facts relative to "Aliens deported (under warrant proceedings) after entering the United States, fiscal year ended June 30, 1928, by race or people and causes."

In that entire year, the latest for which we have available statistics, the total number deported for the entire United States was 11,625. Of that number, only 681 are shown to have been deported as " criminals after entry." In other words, this amounts to less than 6 per cent.

Now, the gentleman wants to know from what countries these deported persons came. This table furnishes that information, too. Of the 681 deported under the aforementioned head, 191 were returned to Mexico. It may surprise some Members of this House to know that neither the second largest number of those deported, nor the third largest number of those deported, came from any of the much-maligned southeastern European countries, but from the so-called Nordic races, so much championed here. Now, gentlemen, I dislike very much to point out the shortcomings of any people. But I feel that it is nothing short of my duty to give the country the facts on the situation. The second largest number of aliens deported as " criminals after entry " were English, of which there were 79.

Among the various races we note that 46 French were deported; also 58 Italians—a considerable number, perhaps, yet 21 fewer than of British. Deportations of some of the nationalities were: Czechoslovakian, 5; Bohemian and Moravian, none; Lithuanian, none; Rumanian, 2; Russian, 3; Bulgarian, Serbian, and Montenegrin, none; but Scotch, 29.

The fact is, gentlemen, and you may as well face the facts, the English propagandists have been fooling the American people right along. It is well known in this connection that propaganda always did constitute a big part of British diplomacy. Through British secret organizations, lobbyists, and through the press the English have succeeded in convincing the American people that the southeastern European immigration to the United States is composed mainly of the lawbreaking class.

Were we to take this propaganda at its face value, we could only conclude, and God only knows how many Americans have erroneously so concluded, that lawbreakers have been coming in from southeastern Europe by the hundreds of thousands. I have just cited figures showing how different are the real facts in the premises.

The document from which I have read to the House to-day is available to anyone. If the gentleman has not been able to secure a copy, I will be glad to furnish him one, together with additional information that will be helpful and beneficial to him in the future.

Mr. GREEN. Does not the gentleman know that it is estimated there are a million criminal aliens in the United States?

Case: 2:21-cr-00129-ALM Doc #: 22-10 Filed: 09/23/21 Page: 8 of 12 PAGEID #: 232

Mr. SABATH. I thank the gentleman. He always comes to my relief when I am nearly exhausted.

This statement of the gentleman from Florida, about the million of alien criminals in the United States is on par, and just as wild and untrue, as many of his other statements on the question of immigration and prohibition. It is amazing how reckless he and the other prohibitionists and restrictionists can be with facts and figures.

Now, I have with me information here that I have been furnished with only to-day by the secretary of the committee, namely, a report from the State Department. If we have no confidence in the Labor Department or the Commissioner of Immigration, although I know he is a sincere and well-meaning man, and so is the Secretary of Labor, we certainly have confidence in the Secretary of State. I am sorry that the incoming newly elected President will not see fit to reappoint the present incumbent as Secretary of Labor, because I know that he has done splendid service in the position that he occupies, and especially during the last campaign.

Mr. GREEN. Mr. Chairman, will the gentleman yield right there?

Mr. SABATH. No; I can not yield.

Mr. GREEN. I think the Secretary of the Treasury is the one they were most interested in.

Mr. SABATH. Oh, I know you people are interested in the Treasury and in money.

Mr. GREEN. We are interested in the Secretary of the Treasury when he opposes a $24,000,000 additional appropriation for prohibition enforcement.

Mr. SABATH. Yes; I know you and all your prohibitionists are just anxious to get hold of the $24,000,000, and, if possible, more, so that you can provide for more lucrative jobs for the professional prohibitionist fellows.

The gentleman wanted to know the number of aliens that are on the list that might be deported, and what proportion of them had been deported. I have to repeat that the number who have been deported was a little over 11,000, and I believe that under the present law the number will not be increased, although I am ready to vote for any additional appropriation that may be necessary.

Right in connection with this, Mr. Chairman and members of the committee, let me call your attention to one thing: I observe that yesterday the Secretary of the Treasury agreed to an additional appropriation for the Coast Guard and for our border patrol. I have advocated for years that the service should be unified. Why should we have a thousand or twelve hundred immigration inspectors at $2,000 each and other inspectors as well doing work in the same section of our country, and doing nearly the same work? We could easily save millions of dollars and secure a better enforcement of the law on our borders and at the same time secure much better and more efficient service if the inspection force were unified, and for that reason I hope you gentlemen on the Committee on Appropriations and you other men of influence will be able to bring home to the Secretary of the Treasury that information that should have been his that this department should be unified. We would be able to secure thereby an inspection and examination and control of our border lines without the additional expenditure of $2,000,000 or $5,000,000.

Now, as I am nearly exhausted—not in convincing material but in strength—I shall be glad to yield the floor. How much time have I consumed, Mr. Chairman?

The CHAIRMAN. Twenty minutes.

Mr. SABATH. I am thankful for the courtesy of my friend, the chairman, and the membership of the House, in giving me this opportunity at this time.

Mr. JENKINS. Mr. Chairman, in the momentary absence of the gentleman from Washington [Mr. JOHNSON], I yield to the gentleman from Texas [Mr. BOX] 10 minutes.

The CHAIRMAN. The gentleman from Texas is recognized for 10 minutes.

Mr. BOX. Mr. Chairman and members of the committee, Members of the House who were Members of the preceding Congress will recall that this House then passed a deportation bill. It was much more inclusive and, I think, a better bill than this one. But it did not become a law. The fault, if it was a fault, is not chargeable to this House.

During the first session of this Congress your committee reported another deportation bill, somewhat subdued, a little milder in its provisions, and that bill remained here on the calendar indefinitely and had very little prospect of passage. Now we have brought forth a third and still more subdued edition of the original deportation bill.

One reason why this bill is presented in this form is because your committee believes that it has a better chance of passage than a bill such as was reported before; and if Members are not satisfied with this measure because it does not do all the things they think should be done, I suggest to them that, although we can not accomplish all that we believe we should do, that is no reason whatever why the good that this measure will accomplish should not be done.

There are several leading features in this measure which are worthy of attention and fully justify its passage by the House. I want to call attention, first, to a group of offenses named in the first part of the bill. When aliens commit these offenses there is a summary proceeding for their deportation upon its being found that they are guilty of these offenses and are undesirable aliens. You will find them grouped in the first portion of the bill—those who engage in the sale of narcotics and others who are guilty of the commission of certain other offenses therein named. Then there is another group of offenses. When aliens commit any of those latter offenses it is necessary, before they can be deported, that they shall have been convicted in a court of record and given the sentences prescribed. In viewing this legislation and wondering why former measures have been so modified, you should give attention to the fact that we have a very large number—and I could quote official figures if it were necessary to do so—of people now in the United States who are subject to deportation and who are not being deported. It seems not wise to add a vastly increased number when the number is so great and the Government is not now dealing with them adequately. Take, for instance, aliens who are guilty of the violation of the liquor laws. A number of gentlemen have asked questions about that. I would not undertake to estimate the number, but I would say it is very great. With Congress willing to appropriate only enough money to deport about 12,000 aliens per year, it would seem to be utter folly to authorize the deportation of 50,000 or 100,000 more. We do not want the law to appear utterly helpless and ineffective, and therefore your committee has concluded for that reason to leave out a lot of these offenses. When these offenses are committed many of those who commit them are tried in a police court. The sentences are short. It is not certain that it is wise to deport a man who has been convicted in a magistrate's court or in any court other than a court of record.

Mr. LAGUARDIA. Will the gentleman yield?

Mr. BOX. Yes.

Mr. LAGUARDIA. When these blanket injunctions are issued during a labor dispute, it is quite possible for a man to be committed for contempt or for the disobedience of an injunction and thus come under the provisions of this bill.

Mr. BOX. If that is true—and I would not want to be directed into a discussion of it—I will say to the gentleman that that line of offenses was not considered by the committee in reporting this legislation, and I think the gentleman will find that the Department of Labor must find, in addition to other things, that they are undesirable aliens.

Mr. LAGUARDIA. In all these cases?

Mr. BOX. I think so.

Mr. LAGUARDIA. That would be helpful, but I fail to find it in the bill.

Mr. BOX. I think the gentleman will find that in the bill. Then there is another class of aliens with which we have been dealing heretofore. I refer to immigrants who approach the border, are detected, and then ordered deported. If such immigrants have been rejected at the border, they can attempt to enter and reenter repeatedly, subjecting themselves to no inconvenience except being pushed back across the border. We have inserted in this bill a provision providing for their punishment in case they attempt to reenter the country or to enter it in any manner illegally. If an adequate force is provided to intercept those who enter the country illicitly, and they are carried into the courts and punished for their efforts to disregard the immigration laws, that will have a very beneficial and helpful effect in procuring a better enforcement of the law.

There are many features of the measure which I would like to discuss with the House at length. However, an adequate discussion of them would require much more time than any of us can take under the circumstances here. I therefore merely say to my colleagues that while this measure does not accomplish all that the country would like to accomplish in this direction, it is a moderate but substantial improvement of the present law. The committee amendment, which I understand the chairman expects to present, ought to be adopted and the bill as thus amended ought to pass the House. [Applause.]

Mr. Chairman, I yield back the remainder of my time.

Mr. JOHNSON of Washington. Mr. Chairman, I yield four minutes to the gentleman from Florida [Mr. GREEN].

Case: 2:21-cr-00129-ALM Doc #: 22-10 Filed: 09/23/21 Page: 9 of 12 PAGEID #: 233

Mr. GREEN. Mr. Chairman, this is a bill that is as far as it goes. I would like to see the committee offer a much more stringent deportation bill in view of the fact that the department, as I understand, has estimated there are now 1,000,000 aliens in the United States who entered unlawfully.

I would also like to see the bill go far enough to deport for one offense, though it happened to carry only a 30-day conviction, be it for prohibition violation or what not. I do not entertain the sob stuff about separating families, and all the propaganda which is usually forced before the committees and before the House in regard to breaking down the immigration laws.

I believe if our department has not sufficient machinery to enforce the deportation laws, the Congress, in defense and in protection of the laboring forces of America and the homes and institutions of America, should provide sufficient funds for this purpose.

I believe there is no more serious question confronting the organized labor forces of the Nation and the institutions of our Government than the immigration question. If you will examine the criminal records you will find that, in proportion to alien population, the percentage of criminals is largely foreign.

Mr. DICKSTEIN. Will the gentleman yield?

Mr. GREEN. A little later. I think you will find the percentage is 80 per cent, according to population.

Mr. COMBS. Will the gentleman yield?

Mr. GREEN. A little later. You will find that 80 per cent of them are of foreign birth, I believe, that is according to population. You will find that the communistic and bolshevistic influences which are here in our Nation are invariably emanating from persons of foreign birth.

Then, my colleagues, when we know these things and when we are sworn to protect the Constitution, when we pay our taxes to uphold American institutions, why not meet these problems frankly? I favor closing the immigration doors and deporting all undesirable aliens. [Applause.]

If we stand for restricted immigration, vote for all these measures and instruct your immigration committees to bring out more drastic bills, even though the august body which sits at the other end of the Capitol seems to be laboring under a different spell.

Mr. DICKSTEIN. Will the gentleman yield now?

Mr. GREEN. I will.

Mr. DICKSTEIN. Where does the gentleman find that 1,000,000 unlawful aliens are in the United States?

Mr. GREEN. One million aliens unlawfully entered the United States and are now here.

Mr. DICKSTEIN. Where does the gentleman get that information?

Mr. GREEN. I understand that is a statement that has recently been made by the Immigration Bureau.

Mr. DICKSTEIN. Does the gentleman state that upon his own knowledge?

Mr. GREEN. Certainly not. I have not checked it up.

The CHAIRMAN. The time of the gentleman from Florida has expired.

There being no further general debate, the bill will be read for amendment.

The Clerk read as follows:

That the following aliens shall, upon warrant of the Secretary of Labor, be taken into custody and deported in the manner provided in sections 19 and 20 of the immigration act of 1917 (U. S. C. title 8, secs. 155, 156), if the Secretary of Labor, after hearing, finds that such aliens are undesirable residents of the United States:

(1) An alien who hereafter violates or conspires to violate the white slave traffic act (U. S. C. title 18, secs. 397-404), or any law amendatory of, supplementary to, or in substitution for, such act.

(2) An alien who hereafter violates or conspires to violate any statute of the United States taxing, prohibiting, or regulating the manufacture, production, compounding, possession, use, sale, exchange, dispensing, giving away, transportation, importation, or exportation of opium, coca leaves, or any salt, derivative, or preparation of opium or coca leaves.

(3) An alien who hereafter willfully conceals or harbors, attempts to conceal or harbor, or aids, assists, or abets any other person to conceal or harbor, any alien liable to deportation.

(4) An alien who hereafter willfully aids or assists in any way any alien unlawfully to enter the United States.

(5) Any alien who hereafter enters the United States at any time or place other than as designated by immigration officials, or eludes examination or inspection by immigration officials, or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact.

(6) An alien who is convicted of any offense (committed after the enactment of this act and at any time after entry) for which he is sentenced to imprisonment for a term of one year or more, and who is thereafter convicted of the same or any other offense (committed after the enactment of this act and at any time after entry) for which he is sentenced to imprisonment for a term of one year or more.

(7) An alien who is convicted of any offense (committed after the enactment of this act and within 10 years after entry) for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under two or more previous convictions of the same or any other offense (committed after the enactment of this act), amounts to five years or more.

Mr. JOHNSON of Washington. Mr. Chairman, I offer the following committee amendment:

The Clerk read as follows:

Page 4, after line 9, insert a new subsection to read as follows:

"(8) An alien who is convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, for which he is sentenced to imprisonment for a term of six months or more; or who, having been convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, is thereafter convicted of carrying on or about the person, transporting, or possessing any weapon or explosive bomb, regardless of the sentence in either case. This subsection shall apply only in the case of offenses committed after the enactment of this act."

Mr. JOHNSON of Washington. Mr. Chairman, this amendment is self-explanatory.

Mr. LAGUARDIA. Will the gentleman yield?

Mr. JOHNSON of Washington. I yield.

Mr. LAGUARDIA. Even the case under this provision would be subject to review by the Secretary of Labor as provided in the first section here as an undesirable alien?

Mr. JOHNSON of Washington. Yes.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Washington.

The question was taken, and the amendment was agreed to.

Mr. SABATH. Mr. Chairman, I offer the following amendment.

The Clerk read as follows:

Page 4, after line 9, and after the amendment just agreed to, insert a new subdivision to read as follows:

"An alien who has no lawful and visible means of livelihood, who has been convicted for the second time as a vagrant, if it appears that in each case at the time of his arrest, he was carrying on his person or in a vehicle, a concealed pistol, revolver, gun, or bomb."

Mr. SABATH. Mr. Chairman, this is the amendment that I alluded to before, and it ought to pass without any opposition.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Illinois.

The question was taken; and on a division (demanded by Mr. JOHNSON of Washington) there were 26 ayes and 42 noes.

So the amendment was rejected.

Mr. DICKSTEIN. Mr. Chairman, I move to strike out the last word. Mr. Chairman and members of the committee, I doubt whether anything I may say will influence your vote, but I think you are working very fast and certainly working in haste. I venture to say that 9 out of 10 Members of the House can not explain if I asked them certain questions regarding this legislation, and how drastic it is. I am not going to speak about the constitutionality of the bill, I will leave that to my colleagues and the gentleman from Florida.

So far as I am concerned, I will give you the meat of the proposition.

The new deportation bill is a decided improvement over the bill reported by the committee. It does not change the limitation statute of the existing deportation provisions. It does not make the inspectors of immigration judges and jurors or give them any discretionary powers. It consists of seven sections, which briefly provide as follows:

First. It deports all violators of the white slave traffic act. We have no objection to that.

Second. It deports all violators of the narcotic act. We have no objection to that.

Third. It deports any alien who willfully harbors or conceals aliens liable to deportation. We have no objection to that.

Fourth. It deports any alien who assists willfully another alien to enter the United States unlawfully. We have no objection to that.

Fifth. It deports aliens who enter the United States at an improper place or elude examination by an immigration inspector. We have no objection to that.

Sixth. It deports an alien who is convicted of any offense for which he is sentenced for one year or more. I certainly object to this clause. If the offense were a felony, I have no objection,

but I can not accept the broad definition of "offense," which appears in the act.

Seventh. The same objection applies to the next provision, which makes an alien deportable if two or more convictions will total 2 years or more within 10 years after entry. The same objection is made as is made to the preceding provision. If the offense be a felony, I am satisfied; but where it is the violation of some police regulation or the prohibition law, I certainly can not accept it.

An attempt was made a number of years ago to insert in the deportation bill the question of violations of the prohibition law. So far as I am concerned, I am not talking about alien violators who willfully attempt to smuggle liquor into the United States or moonshiners or persons who are bringing in poisonous liquors. What I am referring to is persons who innocently and under circumstances may be found in possession of liquor and who may be sentenced for one year or more by some judge who is a fanatic on the question. It is needless for me to mention the States in which judges habitually impose stiff sentences for the most trivial liquor violation.

It may further happen that a poor alien, who may otherwise have a good moral character and who has raised an American family, may be subject to the attack under this proposed amendment if he should by chance be convicted of a violation of the prohibition law.

Proponents of this bill apparently do not want to insert a paragraph in this proposed deportation bill by saying so in the American language that they intend to deport persons who violate the prohibition law, and so they express it under the heading of "any offense."

It is needless to say that this offense, if committed by anybody, does not make him an undesirable person to remain in the United States; and we can not compare them to persons who violate the white slave traffic law and the narcotic act.

Objection made to be raised to the provisions of section 2, where in a case of an indeterminate term the term actually served shall be considered on the basis of the length of sentence. It will be observed that under the laws of New York, for instance, a good many misdemeanors, even of a trivial nature, are punishable by an indeterminate term, and therefore a person may be convicted several times of trifling violations of law and have deportation stare him in the face if this bill is not amended.

I respectfully suggest that wherever the term "offense" appears in the act it should be changed to "felony." If that correction is made, I shall be prepared to accept the bill as it stands.

The minority of the committee is not opposed to deportation; as a matter of fact, in seven sections you will find in the proposed deportation law, to five of them we have no objection. I want to call your earnest and serious attention to sections 6 and 7 of this proposed bill. In my opinion, if you read it twice you will hesitate as to whether or not you would agree to the policy and advisability of striking it out.

As to the proposition on page 7, paragraph 6, where it says a person convicted of "any offense." Why do they not provide for a person convicted of a felony instead of a person convicted of "any offense"? The present deportation law is, I maintain, more than sufficient to deport every undesirable alien. Whether it is going to be workable or not, it is a repetition of the same deportation provisions that we had in the previous act.

Mr. CRAIL. Mr. Chairman, will the gentleman yield?

Mr. DICKSTEIN. Yes.

Mr. CRAIL. In the gentleman's State, can they send a man to prison for a year for anything less than a felony?

Mr. DICKSTEIN. Yes; they can for a misdemeanor. We can send them up for a indeterminate sentence, which means three years.

Mr. LaGUARDIA. For spitting on the sidewalk.

Mr. DICKSTEIN. Yes. Under the provisions of this bill a person who has been here for 20 years and who has committed three or four offenses, if they total up to 2 years in the 20 years, can be deported, and what are you going to do with his wife and family; who is going to take care of that wife and family?

Mr. GREEN. Send them with him.

Mr. DICKSTEIN. Oh, the only time that I can answer the gentleman's question is, if he will come back with me to-morrow and tell me the difference between a white horse and a black horse and which horse eats more, then I shall be in a better position to yield to some of his questions.

Mr. GREEN. I will do that if the gentleman will support with me a proposition closing the doors to immigration altogether for five years.

Mr. DICKSTEIN. Then you would have to throw everyone out of Florida.

Mr. GREEN. I am in favor of a restriction for five years.

Mr. DICKSTEIN. You better go back home and tell some of your townsmen not to charge $1 for a glass of beer that is not worth a nickel. [Laughter.] 4You go back and tell them that.

Mr. GREEN. If the gentleman knows of a place in Florida or elsewhere where they sell beer openly, I will send the prohibition agents there.

Mr. DICKSTEIN. If the gentleman will come with me to-morrow, I will show him where it is.

Mr. GREEN. I will not go with you. You take the prohibition agents with you.

Mr. DOWELL. Mr. Chairman, I make the point of order that both gentlemen are out of order, and I shall insist upon their proceeding in order.

The CHAIRMAN. The gentleman from New York will proceed in order.

Mr. SCHAFER. Mr. Chairman, will the gentleman yield?

Mr. DICKSTEIN. Yes.

Mr. SCHAFER. The gentleman from Florida [Mr. GREEN] desires to entirely close the doors to immigrants and wants to deport everybody. His speech indicates that the only criminals are aliens. I would like to see him so amend his views as to be willing to deport the notorious criminals in the Ku-Klux Klan organization.

Mr. DICKSTEIN. I have no objection.

The CHAIRMAN. The time of the gentleman from New York has expired.

Mr. LaGUARDIA. Mr. Chairman, I offer the following amendment, which I send to the desk and ask to have read.

The Clerk read as follows:

Page 3, line 2, after the word "offense," insert the words "involving moral turpitude"; and on page 4, line 3, after the word "offense," insert the words "involving moral turpitude."

Mr. LaGUARDIA. Mr. Chairman, I submit this amendment for the purpose of making clear what I am sure is the intent of the committee.

Mr. JOHNSON of Washington. But it is not the intent of the committee.

Mr. LaGUARDIA. Mr. Chairman, that is a frank and honest admission. Therefore I shall change my statement and say that I offer my amendment in order to make this law somewhat in keeping with the ideas of fair men and men who are versed in the law. To have this law apply to men who are convicted of offenses which the chairman of the committee has declared do not necessarily involve moral turpitude is so extreme as to make its very purpose ridiculous. We have the declaration of the chairman that it is not the intention of the committee to deport only in cases involving moral turpitude, and that destroys the logical, the sensible, the sound and honest intent, as described by the gentleman from Texas [Mr. Box]. You have a proposition here which requires very serious attention. If it is limited to offenses involving moral turpitude, then you embrace in the provisions of the law cases of murder, assault, burglary, robbery, arson, rape, all the crimes in the penal laws known as malum per se. But if you leave it open, with the meaning which the chairman of the committee has declared is the intention of the committee, you are providing for deportation in cases of violation of traffic regulations, or in violation of a town ordinance, a misdemeanor, or any trivial matter, and, mark you, without a statute of limitation. A man may be deported for the most trivial offenses.

Mr. JOHNSON of Washington. Mr. Chairman, will the gentleman yield?

Mr. LaGUARDIA. Yes.

Mr. JOHNSON of Washington. The gentleman understands that the present deportation laws have to do with those who are convicted of crimes involving moral turpitude. This prosecution is dealing with convictions, each of a year or more, and it is not likely that any court in the land will send anybody up for one year for violating a traffic regulation.

Mr. LaGUARDIA. I will say to the gentleman that right in the great State of Pennsylvania in the coal region a man may be sent to jail for standing on the street. The private coal and iron police of the coal companies—thugs and perjurers, that is what they are—may send a man to jail for holding a meeting on his own property. That is the situation I am trying to overcome.

Mr. TARVER. If the gentleman will yield, the gentleman I am sure is aware that the highest courts in the country have sustained the ruling that the manufacture and sale of intoxicants is not a crime involving moral turpitude. If this amendment is adopted, any bootlegger or manufacturer of intoxicating liquor could not be deported irrespective of conviction.

Mr. LAGUARDIA. If the gentleman will support my amendment, I will support an amendment providing for the deportation of the bootlegger.

Mr. TARVER. I would accede to the gentleman's proposal if I could be assured that such an amendment——

Mr. LAGUARDIA. I will withdraw my amendment if the gentleman will offer such an amendment.

Mr. TARVER. I have such an amendment prepared, and if the gentleman will withdraw his amendment I will offer my amendment.

Mr. LAGUARDIA. I want to say to the gentleman from Georgia that the proposition contained in this bill and as admitted by the chairman of the committee is so extreme, so far-fetched that my amendment should be adopted.

The CHAIRMAN. The time of the gentleman has expired.

Mr. LAGUARDIA. I ask for three additional minutes.

The CHAIRMAN. Is there objection? [After a pause.] The Chair hears none.

Mr. TARVER. If the gentleman will stand by his statement and withdraw his amendment, I will offer my amendment.

Mr. LAGUARDIA. I ask unanimous consent that my amendment may be held in abeyance pending the amendment to be offered by the gentleman from Georgia.

The CHAIRMAN. Is there objection?

Mr. McCORMACK. I object.

The CHAIRMAN. The question is on the amendment offered by the gentleman from New York.

The question was taken, and the Chair announced the noes appeared to have it.

On a division (demanded by Mr. SCHAFER) there were—ayes 10, noes 70.

So the amendment was rejected.

Mr. SABATH. Mr. Chairman, I desire to offer an amendment.

The CHAIRMAN. The Clerk will report the amendment.

The Clerk read as follows:

Page 3, line 13, strike out the words "in any way."

Mr. SABATH. Mr. Chairman and gentlemen, I hope you have before you the bill, and if you will look at page 3——

Mr. LAGUARDIA. What line?

Mr. SABATH. Line 12.

Mr. JOHNSON of Washington. The committee will accept the amendment. I would like to say the words mean nothing anyway, and there is no objection to striking them out.

The CHAIRMAN. The question is on agreeing to the amendment.

The question was taken, and the amendment was agreed to.

Mr. SABATH. Mr. Chairman, I have another amendment.

The CHAIRMAN. The Clerk will report the amendment.

The Clerk read as follows:

Page 4, line 4, strike out "10" and insert "5."

Mr. SABATH. You will find, Mr. Chairman and gentlemen, on page 4, paragraph 7, starting out with line 3, the following:

(7) An alien who is convicted of any offense (committed after the enactment of this act and within 10 years after entry) for which he is sentenced to imprisonment for a term which, when added to the term to which sentenced under two or more previous convictions of the same or any other offense (committed after the enactment of this act), amounts to two years or more.

My amendment strikes out the word "10" and substitutes the word "five," so that the paragraph will provide—

that within five years after his entry—

In lieu of 10 years, and so forth.

Now, we know that after a man has been here for five years he has, more or less, acquired the habits and customs of our country, and if, in due course of time, he commits some violation or offense of which he may be found guilty, which may be only a misdemeanor, or he may be guilty of something else, and due to two or three such convictions, sentence would amount to two years, he could be deported up to 10 years of his residence within the United States. Now, I feel that it would be reasonable if we would shorten that to five instead of ten.

Mr. DICKSTEIN. Does not the gentleman think that instead of using "any conviction" it would be better to use the word "felony" in sections 6 and 7?

Mr. SABATH. I am not speaking of that. This amendment is pending now, and I feel that it should be adopted.

The CHAIRMAN. The question is on agreeing to the amendment offered by the gentleman from Illinois.

The question was taken, and the amendment was rejected.

Mr. JOHNSON of Washington. Mr. Chairman, I move that all debate on this section and all amendments thereto be now closed.

Mr. TARVER. Mr. Chairman, I have been trying for 15 minutes to get the floor.

The CHAIRMAN. The gentleman from Washington moves that all debate on this section and amendments thereto be now closed. The question is on agreeing to the motion of the gentleman from Washington.

The question was taken, and the Chair announced that the ayes appeared to have it.

Mr. TARVER and Mr. SCHAFER demanded a division.

The CHAIRMAN. A division is demanded.

The committee divided; and there were—ayes 65, noes 8.

Mr. SCHAFER. Mr. Chairman, I make the point of order that there is no quorum present.

The CHAIRMAN. The Chair will count.

Mr. SCHAFER. Mr. Chairman, I will withdraw that point of order.

The CHAIRMAN. The gentleman from Wisconsin withdraws the point of order.

Mr. TILSON. Mr. Chairman, may I proceed for two minutes out of order?

The CHAIRMAN. The gentleman from Connecticut asks unanimous consent to proceed for two minutes out of order. Is there objection?

Mr. SCHAFER. Reserving the right to object, Mr. Chairman, did we not just adopt the motion of the gentleman from Washington [Mr. JOHNSON] closing debate on the pending question?

The CHAIRMAN. That is correct.

Mr. TILSON. I am not going to debate the question at all, I assure the gentleman.

The CHAIRMAN. Is there objection to the request of the gentleman from Connecticut?

There was no objection.

Mr. TILSON. Mr. Chairman, as I understand the rule under which we are now operating, it will be necessary to continue to-day if this bill is to be finished under the rule. It happens that we have now reached about the hour of adjournment, and it seems that we have several sections of the bill still to consider that will require some little time. To-morrow we are to be in session and the days be not crowded at all. I am wondering whether if we rose and went into the House we might be able to secure unanimous consent to go on with this bill to-morrow instead of continuing to-day. Is there anyone who will object to this request in the House?

Mr. TARVER. I object.

Mr. SCHAFER. I shall object unless the vote taken to close debate on the section is vacated.

Mr. TARVER. I shall object unless I shall be afforded the same opportunity of presenting my amendment as other Members have had.

Mr. JOHNSON of Washington. There is no desire at all, I will say to the gentleman, to keep off legitimate and proper amendments. Just as the gentleman from Connecticut has said, the rules confine us to one day. The hour is getting late. If we can come to an agreement by unanimous consent, we may be able to finish the bill.

Mr. TARVER. I shall object unless you follow the suggestion of the gentleman from Wisconsin that we vacate the motion to close debate.

Mr. TILSON. The committee can vacate its own action at this stage by unanimous consent.

Mr. JOHNSON of Washington. If we can have the understanding that we are not foreclosed because the rule provides for one day and can continue to-morrow, I will be very pleased to give the gentleman the time he wants.

Mr. LAGUARDIA. I will state that while I shall invoke every honorable and fair parliamentary and strategic measure to defeat the bill I will not avail myself of the privilege of raising the question of consideration to-morrow. I think it is for the best interests of all concerned that we have more time to-morrow to consider the bill.

Mr. TILSON. It seems to me that is true, and if the Members present are willing to agree to this I should like to make the request in the House, where it will be binding.

Mr. JOHNSON of Washington. Mr. Chairman, I ask unanimous consent to vacate the proceedings of the committee by which debate on this section was closed. Is there objection?

Mr. NEWTON. Mr. Chairman, reserving the right to object, and I shall not object, should there be an objection when we go into the House, I presume the procedure will be that we will go back into the Committee of the Whole and complete our labors to-day.

Mr. JOHNSON of Washington. That is so understood.

Mr. GREEN. And the gentleman from Georgia [Mr. TARVER] will be given an opportunity to offer his amendment to-morrow?

Mr. JOHNSON of Washington. That is understood.

The CHAIRMAN. The gentleman from Washington asks unanimous consent to vacate the proceedings limiting debate on this section. Is there objection?

There was no objection.

Mr. JOHNSON of Washington. In accordance with the understanding just reached, Mr. Chairman, I move that the committee do now rise.

Mr. COOPER of Ohio. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. COOPER of Ohio. I have an amendment at the Clerk's desk. What will be the status of that amendment?

The CHAIRMAN. The amendment offered by the gentleman from Ohio has not yet been reported. It can be offered to-morrow when the House is in the Committee of the Whole. The question is on the motion of the gentleman from Washington that the committee do now rise.

The motion was agreed to.

Accordingly the committee rose; and the Speaker having resumed the chair, Mr. Raker, Chairman of the Committee of the Whole House on the state of the Union, reported that that committee had had under consideration Senate bill 5094, making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law, and had come to no resolution thereon.

Mr. TILSON. Mr. Speaker, I ask unanimous consent that on to-morrow it may be in order to continue the consideration of Senate bill 5094, which has been under consideration in the Committee of the Whole to-day.

The SPEAKER. The gentleman from Connecticut asks unanimous consent that to-morrow it shall be in order to consider Senate bill 5094. Is there objection?

Mr. GARRETT of Tennessee. Under the rule?

The SPEAKER. Under the rule; yes. Is there objection?

There was no objection.

### LEAVE OF ABSENCE

By unanimous consent, leave of absence was granted to Mrs. Norton, for an indefinite period, on account of illness.

### BATTLE FIELDS AT BRICES CROSS ROADS AND TUPELO, MISS.—CONFERENCE REPORT

Mr. MORIN. Mr. Speaker, I present a conference report on the bill (H. R. 8736) to provide for the inspection of the battle field of Brices Cross Roads, Miss., and the battle field of Tupelo, or Harrisburg, Miss., for printing under the rule.

### CONSTRUCTION AT THE MILITARY ACADEMY—CONFERENCE REPORT

Mr. MORIN. Mr. Speaker, I present a conference report on the bill (H. R. 11469) to authorize appropriations for construction at the United States Military Academy, West Point, N. Y., for printing under the rule.

### MORRIS FOX CHERRY—CONFERENCE REPORT

Mr. MORIN. Mr. Speaker, I present a conference report on the bill (H. R. 12538) for the benefit of Morris Fox Cherry, for printing under the rule.

### DEFINITION OF THE TERMS "CHILD" AND "CHILDREN"—CONFERENCE REPORT

Mr. MORIN. Mr. Speaker, I present a conference report on the bill (H. R. 12449) to define the terms "child" and "children" as used in the acts of May 18, 1920, and June 10, 1922, for printing under the rule.

### THE CONGRESSIONAL CEMETERY

Mr. ABERNETHY. Mr. Speaker, I ask unanimous consent to extend my remarks in the Record upon a bill which I have introduced in the House and which has been favorably reported by the Committee on Military Affairs, a bill relating to the Congressional Cemetery, and I desire to include in that extension certain data included in the report of the hearings about this cemetery.

The SPEAKER. The gentleman from North Carolina asks unanimous consent to extend his remarks on a bill introduced by himself. Is there objection?

There was no objection.

Mr. ABERNETHY. Mr. Speaker, the Military Affairs Committee has reported unanimously H. R. 11916, a bill introduced by me for the care and preservation of certain lands and monuments in the Congressional Cemetery.

This historic cemetery, in which many of the Nation's heroes and great men are buried, has been allowed to lapse into decay and the monuments and gravestones to deteriorate for the want of proper care and protection. A large part of this cemetery is Government-owned ground. The Government cared for the same for quite a while, but for many years no care has been given it.

The bill introduced by me and recommended by the Military Affairs Committee puts the care of that part of the cemetery owned by the Government under the supervision of the War Department.

In the hearings before the committee certain historical data concerning the Congressional Cemetery were produced, and under the permission granted me I am having the same inserted in my remarks. I am also including certain letters and other data showing the patriotic organizations which favor this bill, which were also placed in the hearings.

The Sons of the American Revolution submitted to me for the committee the following data:

1. The remains of Jacob Gideon, a Revolutionary soldier, lie in Congressional Cemetery. He is of special interest also because two of his descendants, Philip F. and John B. Larner, are members of the Columbia Historical Society and the Sons of the American Revolution. Jacob Gideon was a trumpeter and private in the Pennsylvania Militia. His name also appears in the Index of Eckenrode's Virginia Archives. The inscription on his monument, a marble slab, reads:

"In memory of Jacob Gideon, a soldier of the Revolution; died March 3, 1841, aged 87 years."

In the National Intelligencer of March 5, 1841, appeared the following notice:

"Died in this city on Wednesday evening, the 3d instant, Mr. Jacob Gideon, sr., a soldier of the Revolution, aged 87 years. His friends and acquaintances and those of his son, Jacob Gideon, jr., are requested to attend his funeral this morning, Friday, at 11 o'clock, from the residence of his son, on Seventh Street between E and F Streets."

2. Capt. Hugh George Campbell: The actual Revolutionary services of this Hugh George Campbell are somewhat shrouded. His name does not appear in any of the indexes of the South Carolina archives. It is, however, an indubitable fact, obtained from the current literature of his later life, that the inscription on his monument states the historical truth. The inscription reads as follows:

"Beneath this marble rest the mortal remains of Hugh George Campbell, late a captain in the Navy of the United States. He was a native of the State of South Carolina. In the year 1775 he entered as a volunteer on board the first vessel of the war commissioned by the council of his native State. He served his country upward of 22 years as a comrade and died in this city on the 11th day of November, 1820, aged about 62 years."

"Calahan, in Officers of the Navy, 1775 to 1800, has this entry:

"'Hugh George Campbell appointed commander 27 July, 1799, captain 16 October, 1800.'"

3. In the Congressional Cemetery lie the remains of Hon. Elbridge Gerry, who was gathered unto his fathers in Washington during his second year as Vice President, on November 23, 1814. The military services of Gerry are noted by Heitman. It is proper also to record that he was born at Marblehead, Mass., July 17, 1744, graduated at Harvard, and the day of March, of that year, and was interred, the Portrait Gallery states, "Four miles from Washington," which was, in fact, Rock Creek Churchyard. He was reinterred in Congressional Cemetery under one of those quaint cenotaphs. A Revolutionary War, D. A. R. marker stands on his grave and the last phrase of the inscription on his tomb is "a soldier of the Revolution."

4. At this point it will be well to record that Gen. George Clinton was originally interred in Congressional Cemetery, where he remained until a few years ago, when his body was transferred to New York with considerable ceremony.

5. Gen. James Jackson, one of the most distinguished Georgians, reposes in Congressional Cemetery. His enviable military record is to be found in Heitman, and more extensively, together with his civil life, in The National Portrait Gallery. He was Governor of Georgia, and United States Senator from 1801 to March, 1806. He passed away on the 19th day of March, of that year, and was interred, the Portrait Gallery states, "Four miles from Washington," which was, in fact, Rock Creek Churchyard. He was reinterred in Congressional Cemetery under one of those quaint cenotaphs. A Revolutionary War, D. A. R. marker stands on his grave and the last phrase of the inscription on his tomb is "a soldier of the Revolution."

6. Senator Uriah Tracey, of Connecticut: Connecticut Men in the Revolution lists the name of Uriah Tracey in a company that marched from sundry places for the relief of Boston, etc., in the Lexington alarm, 1775, and were formed into an independent and ranging company for Roxbury. The military services of Senator Tracey were of a clerical nature for a short period. There is nothing on his grave to permanently record his army connection. He was the first Congressman to be interred in Congressional Cemetery. This occurred July 19, 1807, by exhumation from Rock Creek.

7. Gen. Thomas Blount, a Representative from North Carolina, was born in Edgecombe County, May 10, 1759, and at the age of 16 entered the Revolutionary Army. In 1780 he became a deputy paymaster